**EARTH ISLAND INSTITUTE, INC.,
Donald May and David Jeffries,
Plaintiffs,**

v.

**SOUTHERN CALIFORNIA EDISON.
COMPANY, Defendant.**

Civ. No. 90–1535–B(BTM).

United States District Court,
S.D. California.

Nov. 19, 1993.

Charles S. Crandall, Thomas D. Mauriello and Pamela M. Parker of Milberg Weiss Bershad Specthrie & Lerach ("Milberg Weiss"), San Diego, CA, for plaintiffs.

Arthur L. Sherwood of Gibson, Dunn & Crutcher, Los Angeles, CA, John Stuart Tinker, Nino J. Mascolo of Southern California Edison Co., Rosemead, CA, and Mark R. Haag, U.S. Dept. of Justice, Environment & Natural Resources Div., Mary St. Peter of E.P.A., Washington, DC, for defendant.

ORDER AWARDING ATTORNEYS' FEES TO PLAINTIFFS IN THE AMOUNT OF $1,408,594.94

BREWSTER, District Judge.

In the above captioned case, plaintiffs have moved the court for its approval of a $2 million attorneys' fees award. On April 19 and 21, 1993, and again on September 20, 1993, hearings were held before the Honorable Rudi M. Brewster. At the first hearing, Charles S. Crandall, Esq., of Milberg Weiss Bershad Specthrie & Lerach ("Milberg Weiss") appeared for plaintiffs; Arthur L. Sherwood, Esq., of Gibson, Dunn & Crutcher, appeared for defendant, and Mark R. Haag, Esq., of the United States Department of Justice, Environment & Natural Resources Division, appeared by telephone.[1] At the second hearing, Mr. Crandall and Thomas D. Mauriello, Esq., of Milberg Weiss appeared for plaintiffs; Mr. Sherwood and John Stuart Tinker, Esq., of Southern California Edison Company ("SCE"), appeared for defendant, and Mr. Haag appeared by telephone. At the third hearing, Mr. Crandall and Pamela M. Parker, Esq., of Milberg Weiss appeared for plaintiffs; Mr. Sherwood and Nino J. Mascolo, Esq., of SCE, appeared for defendant, and Mr. Haag and Mary St. Peter, Esq., of the Environmental Protection Agency ("EPA"), appeared by telephone.

## I. BACKGROUND

### A. Nature of the Case

This action arose out of defendant SCE's operation of the San Onofre Nuclear Generating Station ("SONGS"). On November 8, 1990, Plaintiffs Earth Island Institute, Inc. ("Earth Island"), Donald May and David Jeffries filed suit against defendant for alleged violations of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. §§ 1251 et seq. (West 1986 & Supp.1993), and for nuisance. Plaintiffs sought declaratory and injunctive relief, the imposition of statutory civil penalties, other compensatory and punitive damages, the establishment of an environmental trust fund, and attorneys' fees and expenses.

### B. Primary Issue—the Cooling Process

The SONGS consists of three nuclear power plant "Units," which generate electrical power using pressurized water nuclear reactors. These reactors boil fresh water which is obtained from the Pacific Ocean and contained in a closed loop. The steam created by this process drives the turbines and is then cooled by ocean water. The cooling water intake structures are located approximately 3,000 feet offshore. Together, the intakes collect two million gallons of water each minute. After the ocean water has performed its cooling function, it is returned to the ocean through conduits located approximately 2,500 feet offshore.

---

1. The Department of Justice has standing to oppose plaintiffs' motion pursuant to 33 U.S.C.A. §§ 1365(c)(3) (West 1986 & Supp.1993) and cases interpreting it. *See, e.g., Friends of the Earth v. Archer Daniels Midland Co.*, 780 F.Supp. 95, 98 n. 6 (N.D.N.Y.1992).

As a prerequisite to construction of Units 2 and 3, SCE was required to obtain two types of permits. First, pursuant to the Clean Water Act and California's Porter–Cologne Water Quality Control Act (the "Porter–Cologne Act"), Cal.Water Code §§ 13000 et seq. (Deering 1993), SCE was required to obtain National Pollutant Discharge Elimination System ("NPDES") permits from the California Regional Water Quality Control Board ("Regional Board").[2] Second, pursuant to the California Coastal Zone Conservation Act of 1972 ("Coastal Act"), Cal.Pub.Res.Code §§ 27000 et seq. (Deering 1993), SCE was required to obtain permits from the California Coastal Commission ("Coastal Commission").

The Coastal Commission would not issue permits for the construction of Units 2 and 3 until SCE proved that its proposed facility would not have any substantial adverse environmental or ecological effects. After much public debate, in 1974 the Coastal Commission granted the permit under express conditions: (1) that SCE conduct a comprehensive and continuing study of the marine environment offshore from the San Onofre facility, and (2) that SCE modify the facility's cooling system should the study at any time reveal that regulatory requirements were being violated or that marine life was subject to substantial adverse effects.

To supervise this study, the Coastal Commission created the Marine Review Committee ("MRC"), comprised of three representatives—one chosen by SCE, one by the environmental community and one by the Commission. The MRC enlisted numerous scientists and engineers to assist in the study.

Meanwhile, from the late 1970s until the present litigation, plaintiff Donald May urged the state and federal governments to undertake enforcement action against SCE for what he claimed were serious violations of environmental regulatory standards. In 1989, May allegedly sought the assistance of more than a dozen attorneys, law firms and public interest organizations in bringing a citizen enforcement suit, but none would assist him. Finally, in late 1989, the law firm of Milberg Weiss agreed to take the case.

In August 1989, the MRC completed its Final Report. In the 346-page Report, the MRC concluded that SONGS was causing substantial adverse ecological and environmental effects. Final Report of the Marine Review Committee to the California Coastal Commission, August 1989, MRC Document No. 89–02. It found that SONGS met the regulatory standards for temperature and metals, but not for natural light and marine organisms. *Id.* at 17–18. It also found that the SONGS' intake and discharge mechanisms create substantial turbidity which blocks sunlight necessary for the growth of kelp. *Id.* at 7, 101–128. Fish and other marine life dependent on kelp are, in turn, adversely affected. The MRC found that turbidity is responsible for an approximate 60% reduction in the size of the kelp bed. *Id.* at 7. The Report's Summary stated:

> The plant kills large numbers of organisms in its intake cooling water, and sometimes moves turbid water into the San Onofre kelp bed (SOK).

> The MRC has measured adverse effects on the kelp community in [the] San Onofre kelp bed, including giant kelp, fish, and large benthic invertebrates. These effects, although local, are deemed substantial because kelp is a valuable and limited habitat.

> The MRC calculates that there is a substantial impact on the standing stock of a number of midwater fish populations in the Southern California Bight. The reductions in standing stock are probably between one and ten percent. Because the effects can occur over large populations, we conclude they are substantial.

> The MRC has also measured a reduction in the local abundance of some midwater fish populations. In addition, SONGS kills at least 20 tons of fish per year in its intake system.

> The MRC analyzed a range of options for preventing, reducing, or mitigating these impacts, and presents two sets of options to the Commission. Option 1a is cooling towers; ... Option 1b is moving

---

2. SCE obtained its NPDES permits in June 1976.

the discharges; the MRC recommends against this option. The MRC recommends acceptance of option 2, which involves selection of one or a combination of four techniques: (1) reduction of flow of cooling water through SONGS or other SCE coastal power plants; (2) construction of a high-relief artificial reef designed to maximize fish production; and/or (3) restoration of a wetland. [sic] (4) Upgrading the existing systems at SONGS that are designed to exclude fish from the plant or to return them to the ocean. . . .

The MRC concludes that SONGS is not in compliance with certain water quality regulations. The level of natural light at the bottom, downcoast from SONGS, was 6–16% lower than it would have been without SONGS. There were significant reductions in local populations of midwater fish, and of kelp, fish and invertebrates in the San Onofre kelp bed. . . .

*Id.* at 1–3.

The conclusions of the MRC were hotly disputed by marine scientists on a number of scientific and methodological grounds. Some scientists suggested that SONGS would require new cooling towers, at a cost of approximately $2 billion.

In December 1989, the Regional Board discussed the MRC report and possible enforcement action against SCE. In February 1990, the Regional Board gave notice of a hearing scheduled for April 23, 1990, to consider the issuance of a cease-and-desist order. However, this hearing was repeatedly postponed for more than one year.

### C. Procedural History

In April 1990, plaintiffs served notice of their intention to file suit against SCE upon the EPA, the Regional Board and SCE. Dissatisfied with these parties' responses, plaintiffs filed suit in this court in November, 1990. In May 1991, this court denied defendant's motion for a stay of the action and plaintiffs' motion for a preliminary injunction.

During this period, Magistrate Judge Barry T. Moskowitz skillfully presided over several unsuccessful settlement conferences. After a January 1992 mandatory settlement conference proved futile, Judge Moskowitz set a trial date and the parties embarked on seven months of extensive discovery. To assist the parties, experts exhaustively analyzed SONGS. Meanwhile, in July 1992, with Judge Moskowitz's approval, counsel contacted a Senior United States District Judge and asked him to mediate settlement. He agreed.

On August 5, 1992, this court denied in part and granted in part defendant's motion for summary judgment. In particular, it denied defendant's motion seeking dismissal of plaintiffs' Clean Water Act claim, but granted defendant's motion seeking dismissal of plaintiffs' nuisance claims.

On August 24–25, 1992, the mediation judge heard lengthy oral presentations by both parties and their experts and conducted settlement negotiations with the parties. The parties arrived at a four-part settlement valued at $17 million. The terms of the settlement were as follows: First, SCE would spend $7.5 million on the acquisition and restoration of wetlands in the San Dieguito area. Second, SCE would pay $2 million to the San Diego State University Foundation and the Pacific Estuary Research Laboratory to fund wetlands restoration and research. Third, SCE would commit $5.5 million to an undertaking with Earth Island to develop a marine educational program at Redondo Beach, California, for increasing public awareness of and appreciation for the marine environment. The program, which would be aimed at young adults between the ages of 18–22, would be governed by an executive committee with representatives from both Earth Island and SCE. Finally, SCE would pay up to $2 million in attorneys' fees to plaintiffs' counsel and would not oppose plaintiffs' motion seeking the court's approval of a $2 million fee award. In addition, plaintiffs have waived all civil penalties and injunctive relief, and agreed to withdraw their administrative claims and to forego further judicial or administrative review.

In February 1993, the senior judge who presided over settlement negotiations wrote a letter to the court, urging the court's approval of the settlement as well as the attorneys' fees award. He praised the parties'

counsel and representatives for their exceptional conduct, diligence and efforts in achieving what he believed to be substantial public benefits.

According to plaintiffs' counsel, the senior judge was not alone in his praise for the settlement. Plaintiffs claim:

> The settlement is, by all accounts, outstanding under Clean Water Act jurisprudence ... [and] one of the largest and most unique Clean Water Act citizen suit settlements ever achieved. This settlement has been lauded by the California Coastal Commission, the Regional Water Board, the Sierra Club and a host of other groups and agencies.

Plaintiffs' Memorandum in Support of Motion for Approval of $2 Million Award of Attorneys' Fees and Expenses, filed August 23, 1993, at 7 n. 4.

### D. Court Approval of Settlement

■ On April 19 and 21, 1993, the court heard plaintiffs' motion for approval of the settlement and consent decree. The legal standard for a district court's approval of a proposed consent decree in a suit brought under the Clear Water Act provides:

> Because of the unique aspects of settlements, a district court should enter a proposed consent judgment if the court decides that it is fair, reasonable and equitable and does not violate the law or public policy.... As long as the consent decree comes "'within the general scope of the case' made by the pleadings,'" furthers "the objectives upon which the law is based," and does not "violate[ ] the statute upon which the complaint was based," the parties' agreement may be entered by the court.

*Sierra Club, Inc. v. Electronic Controls Design, Inc.,* 909 F.2d 1350, 1355 (9th Cir.1990) (citations omitted). Pursuant to that standard, this court determined that the proposed settlement was in the public interest, and on June 14, 1993, issued an order granting plaintiffs' motion and dismissing the action with prejudice.

However, the court left open for future determination the issue of the amount of attorneys' fees to be awarded to plaintiffs' counsel. The court refused to approve a $2 million attorneys' fees award without conducting a lodestar analysis, and requested plaintiffs to submit to the court a summary of actual time, billing rates, and expenses incurred.

### E. Court Approval of Attorneys' Fees Award

On August 2, 1993, and again on August 23, 1993, plaintiffs filed motions for the court's approval of their $2 million attorneys' fees award.[3] The award would be comprised of what plaintiffs' counsel called the "lodestar" amount of attorneys' fees and expenses—$1,407,594.94—plus an enhancement of $592,405. Plaintiffs submitted a summary of counsel's time, billing rates and expenses, certified by partners of Milberg Weiss as accurate and consistent with the firm's normal billing rates.[4]

## II. DISCUSSION

### A. Legal Standards for Lodestar Analysis

■ In *Hensley v. Eckerhart,* 461 U.S. 424, 433–37, 103 S.Ct. 1933, 1939–41, 76 L.Ed.2d 40 (1983), a civil rights case, the court articulated a step-by-step process by which courts should determine the reasonableness of an attorneys' fees award. The threshold determination is whether the party seeking attorneys' fees is a "prevailing party." *Id.* at 433, 103 S.Ct. at 1939. This

---

**3.** The hearing was originally scheduled for August 30, 1993, at which time the court would determine a lodestar figure, but would reserve for later hearing the issue of an enhancement. When time conflicts dictated a continuance of the hearing, the parties agreed that the fee motion would be heard in its entirety on September 20, 1993, and that the parties would file supplemental briefs.

**4.** *See* Appendix A. In their papers, plaintiffs repeatedly request the amount of $1,407,594.94. However, the court has just discovered that Milberg Weiss's time and expenses actually totalled $1,407,597.94, as shown on Appendix A. As the court did not discover this discrepancy until after the hearing, the court considers $1,407,594.94 the amount claimed.

standard requires that the moving party have succeeded on "any significant issue in litigation which achieves some of the benefit" sought by plaintiffs. *Id.*

The second step is the court's determination of reasonableness; that is, "reasonable hours times a reasonable rate." *Id.* at 433–34, 103 S.Ct. at 1939. The district court has the discretion to decrease the award sought, depending on whether the court is satisfied that plaintiffs' fee calculation does not reflect "excessive, redundant, or otherwise unnecessary" fees and expenses. *Id.* at 434, 103 S.Ct. at 1939.

The third step is the court's consideration of results obtained. This factor may lead a court to adjust a fee award upward or downward. According to the Supreme Court, "[t]his factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Id.* Under *Hensley*, a court has discretion to "simply reduce the award to account for the limited success." *Id.* at 436–37, 103 S.Ct. at 1941. However, when a court decides to make an adjustment in a fee award, it must provide a "concise but clear explanation" for its decision. *Id.* at 437, 103 S.Ct. at 1941.

Fourth, although it is not mandatory that a court conduct a lodestar analysis, there is a strong presumption that lodestar represents a reasonable fee. *See City of Burlington v. Dague,* — U.S. —, —, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992) (denying enhancement of attorneys' fees award under Clean Water Act). According to the Supreme Court, lodestar is the "guiding light of our fee-shifting jurisprudence." *Id.* For this reason, although this court acknowledges that lodestar analysis is not mandatory, this court adopts lodestar as the appropriate measure of attorneys' fees in this case.

Finally, when an attorneys' fees applicant seeks more than lodestar, the applicant bears the burden of showing the enhancement is "necessary to the determination of a reasonable fee." *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

## B. Plaintiffs' Arguments

Plaintiffs' counsel argue that the court should approve their $2 million fee award on several grounds. First, counsel argue that this fee award has been negotiated at arms-length under the supervision of two other judges, and is not contested. They rely on *Hensley* for the proposition that:

A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.

461 U.S. at 437, 103 S.Ct. at 1941. Plaintiffs' counsel argue that this proposition supports their position that the fee award should be upheld by the court because settlement is desired as a matter of policy.

Second, plaintiffs' counsel argue that, even if lodestar analysis is the appropriate measure, the amount requested is reasonable. They contend that the fee award constitutes only a small proportion of the total settlement award. They argue that this proportion is more than reasonable, given one court's approval of a fee award of $125,000 in a Clean Water Act case which settled for only $25,000. *See Friends of the Earth,* 780 F.Supp. at 97; *see also Rivera v. City of Riverside,* 763 F.2d 1580, 1581–83 (9th Cir. 1985), *aff'd,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (court awards $245,456 in attorneys' fees to plaintiffs who recovered only $33,350 in damages for civil rights violations). In addition, counsel note that both this court and the senior judge who mediated the settlement have commented on the excellent representation provided to plaintiffs in this case, and that this fee represents services rendered over a period of 3½ years.

Third, plaintiffs' counsel argue that, based on the excellent results achieved, a multiplier of 1.66 is appropriate. They rely on cases establishing that a multiplier of 1.66 is within the range of reasonableness. *See, e.g., Fadhl v. City and County of San Francisco,* 859 F.2d 649, 651 (9th Cir.1988). For instance, in *Fadhl,* a civil rights case, the court approved a multiplier of 2.0 when plaintiff encountered extraordinary difficulty in retaining counsel and when evidence showed a

manifest need for fee enhancement to attract counsel to civil rights cases in that particular locality. Plaintiffs' counsel argues that this case supports their position because for a period of fourteen years, more than a dozen attorneys and firms refused to take plaintiff May's case, and because the government failed to take any enforcement action despite repeated pleas by May. Plaintiffs' counsel contend that, without their efforts, May would not have obtained any relief.

### C. Opposition to Attorneys Fees Award

Plaintiffs' opposition came almost entirely from the Department of Justice.[5] The government disagrees with plaintiffs on three main grounds. First, the government contends that lodestar analysis is not only appropriate, but mandatory. Second, the government contends that plaintiffs' counsel's actual time and expenses is not the "lodestar" figure; rather, actual time and expenses are merely the "starting point" for the court's determination of what constitutes a reasonable fee award. Government's Response to Plaintiff's Motion for Approval of $2 Million Award of Attorneys' Fees and Expenses, filed September 3, 1993, at 6. The government defers to the court, however, on what constitutes "reasonable" in this case. *Id.* at 7. Finally, the government contends that enhancement of the lodestar is rarely appropriate, particularly when enhancement is sought based on claims of excellent results and representation, citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986).

### D. Analysis

Preliminarily, the court notes that Milberg Weiss provided excellent representation to plaintiffs. *See Blum,* 465 U.S. at 899, 104 S.Ct. at 1549 (district court in best position to conclude quality of representation is high). However, based on the standards established in *Hensley* and *Dague,* the court must con-

sider more than just the quality of representation provided.

First, the court must consider whether plaintiffs were "prevailing." In cases brought under 42 U.S.C. § 1988, the Supreme Court has emphasized that " '[t]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties.' " *Farrar v. Hobby,* — U.S. —, —, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992) (citing *Texas State Teachers Assn. v. Garland Independent School Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989)). Under this standard, a plaintiff "must obtain an enforceable judgment against the defendant from whom fees are sought ... or comparable relief through a consent decree or settlement...." *Id.* (citations omitted). In *Farrar,* the Court held:

> In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Id.*[6]

As this is a citizen suit, any recovery would not "directly" benefit the plaintiffs any more than it would other citizens. Nevertheless, since the settlement in this case obligates defendant to commit funds to several projects which directly benefit the public, one of which is a joint project with, and presumably benefitting, plaintiff Earth Island, the court holds that plaintiffs are "prevailing" for purposes of attorneys fees analysis.

However, the manner in which plaintiffs have prevailed is another matter. Under *Hensley,* the court must consider results obtained. Here, despite their claims that this $17 million settlement is outstanding, plaintiffs have not persuaded the court that the results obtained are a tremendous victory. In their original complaint, plaintiffs sought

---

5. In its reply brief, SCE states that it defers to the court as to what constitutes a reasonable fee, but does not necessarily support an award of $2 million. It opposes only plaintiffs' proposed order and allegations of inaction by California authorities.

6. As little published case law exists on the issue of attorneys' fees under the Clean Water Act, this court adopts the standards of the above-mentioned case law.

declaratory and injunctive relief as well as substantial monetary damages and penalties for what they asserted were serious violations of environmental standards. Yet, under the terms of the settlement, none of this relief is obtained. The SONGS units continue to operate as they have for more than ten years.

The overall success of a suit goes to the reasonableness of a fee award. *Farrar,* — U.S. at ——, 113 S.Ct. at 574 (citing *Hensley* ). In *Farrar,* plaintiffs sought $17 million in compensatory damages in a civil rights action brought under 42 U.S.C. §§ 1983, 1985 and 1988, but ultimately recovered only nominal damages and attorneys fees. The Court of Appeals reversed the award of attorneys fees, and the Supreme Court affirmed. The Court explained:

> This litigation accomplished little beyond giving petitioners "the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated" in some unspecified way.... When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, ... the only reasonable fee is usually no fee at all.

*Id.* at ——, 113 S.Ct. at 574–75 (citations omitted).

■ This case is not *Farrar.* Although this settlement does not alter the operations of the SONGS, it also is not nominal. It requires a significant expenditure by defendant on projects plaintiffs presumably believe will compensate the public for defendant's environmental impacts. Therefore, although this court has considered and has some skepticism about the results obtained in this case, it is convinced that such results were sufficient to withstand any subtraction from the lodestar.

■ Under *Hensley,* the court's determination of reasonableness also requires an analysis of whether the lodestar figure proffered by plaintiffs represents "reasonable hours times a reasonable rate." 461 U.S. at 434, 103 S.Ct. at 1939. As exhibited in Appendix A, Milberg Weiss bills at premium rates. However, based on the representation

the firm provided, the court accepts these rates as reasonable under the circumstances.

■ The court does not, however, believe plaintiffs' enhancement is reasonable. First, the court disagrees with plaintiffs' *Fadhl* argument, as the reasoning of *Fadhl* was disapproved by the Supreme Court in *Dague,* — U.S. at ——, ——, 112 S.Ct. at 2641, 2643. In *Dague,* brought under the Clean Water Act, the district court approved plaintiffs' lodestar figure for attorneys' fees. It also approved a 25% enhancement, based on Circuit Court precedent which provided that enhancements are appropriate when, " '[w]ithout the possibility of a fee enhancement ... competent counsel might refuse to represent [environmental] clients, thereby denying them effective access to the courts.' " *Id.* at ——, 112 S.Ct. at 2640 (citation omitted). Because plaintiffs suffered a substantial risk of not prevailing and would have had substantial difficulty obtaining competent counsel, the district court awarded a 25% enhancement. The Court of Appeals affirmed.

The Supreme Court reversed. It held that "enhancement for contingency is not permitted under the fee-shifting statutes [including the Clean Water Act] at issue." *Id.* at —— — ——, 112 S.Ct. at 2643–44. The Court felt that an enhancement for contingency would likely substantially duplicate factors already subsumed in the lodestar. *Id.* at ——, 112 S.Ct. at 2641.

Plaintiffs contend that *Dague* is not on point because it involved a non-negotiated, disputed fee award. The court rejects this contention. To the extent that the proposed $2 million fee in this case was the result of negotiation, it too was a disputed fee. The fact that SCE agreed not to oppose plaintiffs' motion for approval of the fee is not persuasive, given the interest by SCE in consummating what appears to the court to be a settlement favorable to SCE.

Second, as stated above, Milberg Weiss's rates are premium rates. The firm's excellence, skill and experience are necessarily subsumed in these rates and reflected in the lodestar. Therefore, it would be duplicative to award plaintiffs an enhancement of the

lodestar due to excellent representation. As the Supreme Court said in *Delaware Valley:*

> [T]he "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award.... Although upward adjustments of the lodestar figure are still permissible ... such modifications are proper only in certain "rare" and "exceptional" cases....

478 U.S. at 565, 106 S.Ct. at 3098 (citations omitted); *see also Blum,* 465 U.S. at 898, 104 S.Ct. at 1548 (novelty and complexity of issues are reflected in billing rate and do not warrant upward adjustment). Therefore, for the foregoing reasons, and because plaintiffs have not met their burden of proving that this case is rare and exceptional, the court declines to award plaintiffs their proposed enhancement.

## III. CONCLUSION

Upon consideration of the moving papers, oral argument thereon, and the foregoing discussion, the court hereby finds that an attorneys fees award of $1,407,594.94 is ample, fair and generous. However, as this figure does not reflect the frustration of sustaining a reduction of a fee which was not opposed by the defendant, the court hereby awards plaintiffs $1,000 in additional attorneys fees.[7] Defendant shall deliver to plaintiffs' counsel, within five days of the filing date of this order, a certified check in the amount of $1,408,594.94.

IT IS SO ORDERED.

APPENDIX A
EXHIBIT A
**MILBERG WEISS BERSHAD HYNES & LERACH**
Southern California Edison
Time Report at Current Rates
Inception to Date

As of 06/22/93

| Time Keepers | Total Hours | Current Rates | Lodestar |
| --- | --- | --- | --- |
| Partners | | | |
| Crandall, C.S. | 1,763.30 | 290.00 | 511,357.00 |
| Weiss, M.I. | 67.00 | 500.00 | 33,500.00 |
| Associates | | | |
| Parker, P.M. | 1,282.50 | 250.00 | 320,625.00 |
| Mauriello, T.D. | 353.50 | 200.00 | 70,700.00 |
| Dollar, D. | 236.00 | 145.00 | 34,220.00 |
| Brownlie, R.W. | 35.25 | 180.00 | 6,345.00 |
| Isaacson, E. | 19.50 | 260.00 | 5,070.00 |
| Paralegals | | | |
| Chaseton, M. | 634.00 | 110.00 | 69,740.00 |
| Courtney, J.M. | 24.00 | 125.00 | 3,000.00 |
| Zellmann, P.K. | 24.00 | 110.00 | 2,640.00 |
| Lozow, J. | 17.00 | 125.00 | 2,125.00 |
| Arnold, K.L. | 11.75 | 110.00 | 1,292.50 |
| Woodward, L.B. | 9.00 | 125.00 | 1,125.00 |
| Imes, J. | 8.50 | 125.00 | 1,062.50 |

7. At the September 20 hearing, the court described the additional $1,000 fee as one for "aggravation" at losing part of a stipulated fee.

As of 06/22/93

| Time Keepers | Total Hours | Current Rates | Lodestar |
|---|---|---|---|
| Law Clerks | 633.25 | 125.00 | 79,156.25 |
| Document Clerks | 195.25 | 85.00 | 16,596.25 |
| Report Totals | 5,313.80 | | 1,158,554.50 |

EXHIBIT B
### MILBERG WEISS BERSHAD HYNES & LERACH

Southern California Edison
Expense Report
Inception to Date

As of 06/22/93

| Expense | Amount |
|---|---|
| Meals, Hotels, Transportation | 31,982.82 |
| Photocopies | 43,716.51 |
| Telephone | 2,933.69 |
| Messengers/Courier Services (Fed Ex, UPS, etc.) | 5,095.71 |
| Postage | 432.70 |
| Fees | 977.42 |
| Court Reporters & Transcripts | 20,376.18 |
| Lexis/Westlaw/Legal Searches | 21,267.48 |
| Experts/Consultants/Investigator | 107,482.54 |
| Special Secretarial (Overtime) | 1,443.23 |
| Facsimile Charges | 12,273.33 |
| Miscellaneous (Graphics and Publications) | 1,061.83 |
| Report Totals | 249,043.44 |

**TOTAL UNBILLED TIME AND EXPENSES AT 06/22/93**   $1,407,597.94