**UNITED STATES of America, Plaintiff,**

v.

**The TELLURIDE COMPANY, and Mountain Village, Inc., d/b/a Telluride Mountain Village, Inc., Defendants.**

**Civ. A. No. 93–K–2181.**

United States District Court,
D. Colorado.

April 20, 1994.

Rebecca A. Lloyd, Dept. of Justice, Environmental Defense Section, Denver, CO, for U.S.

Steven B. Moores, Ass't Regional Counsel, EPA, Region VIII, Denver, CO, Allan Morrissey, Office of Enforcement, EPA, Washington, DC, for E.P.A.

David S. Neslin, Melanie Dummer Mills, Arnold & Porter, Denver, CO., for defendants.

## ORDER DENYING MOTION TO APPROVE CONSENT DECREE

KANE, Senior District Judge.

The United States government commenced this action under the Federal Water Pollution Control Act Amendments of 1972 (the "Clean Water Act"), 33 U.S.C. §§ 1251–1387, seeking injunctive relief and civil penalties against The Telluride Company, Mountain Village Company, Inc., and Telluride Ski Area, Inc. (collectively, "Telco"), developers of the Telluride ski resort in Telluride, Colorado. The complaint alleges that, during its expansion of the ski area and construction of a residential community, golf course and parking facilities, Telco illegally filled approximately 44.5 acres of wetlands without a permit and in violation of the Clean Water Act.

On October 15, 1993, the same day the complaint was filed, the government lodged with the court a consent decree proposing a full settlement of the litigation. Notice of the decree was published in the *Federal Register* in accordance with 28 C.F.R. § 50.7 (1993), and the government received public comment on the proposed settlement. On January 21, 1994, the government requested that I approve and enter the decree. Both the government and Telco have filed briefs in support of that request. They further move for an expedited ruling on the motion. For the reasons explained below, I cannot conclude that the proposed consent decree is fair, reasonable and adequate or in the public

interest. Therefore, I deny the motion to enter the decree.

## I. *Standard of Review.*

The government and Telco urge me to approve this consent decree, invoking the familiar refrain that the court should encourage the settlement of litigation whenever possible. "Parties to a lawsuit may always compromise their dispute. But where the parties wish to incorporate their settlement into a judicial decree—where they seek the imprimatur of judicial approval—the court must give the agreement more scrutiny." *Sierra Club v. Coca–Cola Corp.*, 673 F.Supp. 1555, 1557 (M.D.Fla.1987). This is not the typical litigation between private parties. Indeed, substantial public interests are at stake. In suits affecting the public interest, my role is more searching. *See Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir.1986); *Friends of the Earth v. Archer Daniels Midland Co.*, 780 F.Supp. 95, 99 (N.D.N.Y.1992). Contrary to what the parties' one-sided presentation might suggest, I may not nor would I merely imprimit their decision as though possessed of a clerical rubber stamp. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1424 (6th Cir.1991); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990).

■ I examine a proposed consent decree settling litigation under the Clean Water Act to determine whether it is fair, reasonable and equitable and does not violate law or public policy. *See United States v. Metropolitan St. Louis Sewer Dist. (MSD)*, 952 F.2d 1040, 1044 (8th Cir.1992); *Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir.1990); *Earth Island Institute, Inc. v. Southern Cal. Edison Co.*, 838 F.Supp. 458, 463 (S.D.Cal. 1993). Nearly any consent decree can be viewed simultaneously as "a crackdown or a sellout." William A. Rodgers, Jr., 2 *Environmental Law: Air and Water*, § 4.40 at 584 (1986). Both views are represented in this case. My role, however, is not to substitute my judgment of what constitutes an appropriate settlement or to reform the decree. *Akzo Coatings*, 949 F.2d at 1409; *cf. Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985) ("The court is not entitled to expand or contract the agreement of the parties as set forth in the consent decree....")

Nevertheless, I may not abdicate my responsibility to ensure that the decree upholds the important policies underlying the Clean Water Act simply because the government advises me that I should defer to the EPA's judgment.

The words "fair, reasonable and equitable" have more than a superficial meaning. Fairness incorporates both procedural and substantive components. "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g*, 899 F.2d at 86. Substantive fairness flows from procedural fairness. "To the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness." *Id.* at 87 n. 4 (quoting *City of New York v. Exxon Corp.*, 697 F.Supp. 677, 693 (S.D.N.Y. 1988)); *see also Akzo Coatings*, 949 F.2d at 1433 ("In determining whether a decree is 'fair,' courts have considered ... 'the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved.'"). A consent decree that is substantively fair incorporates "concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible." *Cannons Eng'g*, 899 F.2d at 87. Substantive fairness thus mirrors the requirement that the decree be equitable.

■ Likewise, "the evaluation of a consent decree's reasonableness will be a multifaceted exercise." *Id.* at 89. At least three factors are relevant in discerning whether the decree is reasonable: (1) whether the decree is technically adequate to accomplish the goal of cleaning the environment, (2) whether it will sufficiently compensate the public for the costs of remedial measures, and (3) whether it reflects the relative strength or weakness of the government's case against the environmental offender. *Id.* at 89–90. Overlaid on this evaluation is the most important factor: whether the consent decree is in the public interest and upholds the objectives of the Clean Water Act, the primary of which is "to

restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see Akzo Coatings*, 949 F.2d at 1435 ("Protection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate."); *United States v. Seymour Recycling Corp.*, 554 F.Supp. 1334, 1339 (S.D.Ind.1982).

## II. *The Proposed Consent Decree.*

The stated purpose of the consent decree is to cause Telco "to come into full compliance with the Clean Water Act and the provisions of applicable federal laws and regulations governing discharges of dredged or fill material into waters of the United States." (Consent Decree, ¶ 1 at 3). To this end, the decree first enjoins Telco from any future discharges at the development site in violation of the Clean Water Act. Second, it requires Telco to restore a total of 15.43 acres of wetlands at the ski area in accordance with a work plan attached to the decree. In addition, Telco must complete a mitigation project at Menoken Farms, a site located approximately sixty miles from Telluride, also in accordance with the work plan. The plan requires Telco to construct 26.5 acres of new wetlands at Menoken Farms and to monitor the site for at least three years. Finally, Telco must pay a civil penalty of $143,000 and undertake an additional wetlands preservation project in San Miguel County, Colorado amounting to $42,000 or pay that sum to the government if no suitable project is identified. Telco has not admitted liability for any Clean Water Act violation under the decree.

## III. *Analysis of the Consent Decree.*

██ I am deeply concerned that this consent decree was not developed in a manner that was procedurally or substantively fair. I also question whether the decree is reasonable, particularly with respect to whether it is technically adequate, fully compensates the public for the alleged violations and takes into consideration the risks of litigation. Ultimately, because of these shortcomings, I cannot conclude that it fulfills the objectives of the Clean Water Act.

The record before me is limited. The Department of Justice commenced this litigation on October 15, 1993, the same day it lodged the proposed consent decree with the court. The EPA had previously referred the case to the Department, pursuant to a memorandum agreement between the two entities, on or about September 27, 1993, on a "pre-referral negotiation basis." (*See* U.S.Mem. Br.Supp.Mot. Enter Consent Decree, Ex. C–26) (attaching letter to Richard B. Stewart). The EPA advised the Department that it would "attempt to settle this matter within sixty days of referral and, together with the Department of Justice, memorialize the settlement in a consent decree to be filed simultaneously with the complaint." (*Id.*) The EPA further stated that it "seeks a significant civil penalty from the defendants in order to deter other developers from ignoring the requirements of Section 404 of the Clean Water Act," in the minimum amount of $185,000. (*Id.*)

Therefore, unlike many other environmental enforcement cases, this proposed decree was not the product of the parties' desire to settle long-running litigation through which the strength and weaknesses of each side's case was revealed. *Compare United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir.1990) (decree entered after ten years of litigation). This case was filed merely as the vehicle by which the parties' settlement agreement could receive judicial approval and, if necessary, enforcement when breached. Here, the adversary system has yet to function. I do not hold that the government's practice of filing an enforcement action coupled with a consent decree is per se improper; indeed, it serves a laudable purpose when the negotiations leading to the decree are themselves adversarial. *See Cannons Eng'g*, 899 F.2d at 84 ("Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table.") But where the protections of an adversary system are not present, I undertake a more searching review of a consent decree's fairness.

My skepticism is intensified when I consider the manner in which EPA reached the proposed settlement. In response to public criticisms that "the Department of Justice

chose a process of negotiation that allowed the violator to present his case through his own consultant," and that the EPA lacked adequate resources to oversee the selection of a mitigation site, the EPA writes:

The commentator is correct in his observation that EPA does not have sufficient resources to take full responsibility for selection of sites for wetland mitigation. Without such resources, the Agency must assume an oversight role, similar to the role it plays in overseeing remedial actions under Superfund by potentially responsible parties who clean up contaminated property. In an oversight role EPA is to some extent dependent upon the information provided by the defendants' consultant. In this case, EPA has worked with Dr. Eric Olgeirson on other, unrelated matters and has no reason to believe that he would not apply the best professional standards to the restoration and mitigation tasks required of him.

(U.S.Mem.Br.Supp.Mot. Enter Consent Decree, Ex. B at 12.) In fact, the record shows that the EPA relied heavily, if not exclusively, on Dr. Olgeirson, Telco's environmental expert, to produce the work plan for Telco's remediation and mitigation projects.[1] Unlike Superfund cases that typically involve settlements reached by many parties with competing interests to protect, *see, e.g., Cannons Eng'g*, 899 F.2d at 83 (Superfund litigation involving more than six hundred potentially responsible parties), there is but one defendant in this Clean Water Act case and much less justification for the EPA to act in an oversight role.

■ Under these circumstances, the government's suggestion that I "pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment" borders on the ludicrous. (U.S.Mem.Br.Supp.Mot. Enter Consent Decree at 17.) An agency's judgment is entitled to deference when it is based on reasoned decisionmaking. The reasons must be its own, not those of a well-heeled defendant. Here, in its "oversight role," the EPA simply reacted to the proposals offered by Telco's expert; it did not "pull the laboring oar" in constructing some of the most essential terms of the proposed settlement and remedial plan. *Cannons Eng'g*, 899 F.2d at 84; *see also United States v. Vertac Chem. Corp.*, 756 F.Supp. 1215, 1218 (E.D.Ark.1991), *aff'd sub nom., United States v. Hercules, Inc.*, 961 F.2d 796 (8th Cir.1992). Consequently, where another party and not the EPA has developed a remedial cleanup plan, the policy of the law to encourage such settlements is less forceful and review of the resulting plan need not be deferential. *See Akzo Coatings*, 949 F.2d at 1425 n. 12; *Cannons Eng'g*, 899 F.2d at 84.

Finally, and most importantly, I cannot overemphasize the role that the public plays in this process. Federal regulations require the government to publish a proposed consent decree in the *Federal Register* for public comment. This is not an inane exercise. "[T]he manifested willingness of EPA to thoroughly consider all oral and written comments made with regard to the proposed decree" is a key indicator of whether the

---

1. In addition, the government appears to have accepted certain conclusions of the experts hired by Telco in determining the economic advantage to Telco in allegedly violating the Clean Water Act, although it does not disclose which ones. (*See* U.S.Mem.Br.Supp.Mot. Enter Consent Decree at 12 n. 6.) Economic advantage to the violator is one of the primary factors the EPA uses to determine the amount of civil penalties it seeks. Mr. Ford Frick, Telco's resort economics expert, concluded that with the exception of certain minimal compliance and site preparation costs, "utilization of wetlands in the development of the Telluride Mountain Village resulted in no additional economic benefit to [Telco] than what would have been achieved without wetland incursion." (U.S.Mem.Supp.Mot.Enter Consent Decree, Ex. D at 12.)

Furthermore, while the government explains at some length the methodology the EPA employs in accordance with its "Clean Water Act Penalty Policy for Civil Settlement Negotiations," a copy of which has not been provided to the court, it fails to identify the estimated dollar values the EPA used in assessing the elements of the economic benefit of noncompliance which were used to determine the ultimate civil penalty. (*See, e.g.,* Mem.Br.Supp.Mot.Enter Consent Decree, Ex. B at 4.) (stating that "EPA applied the ratios created by the difference in the value of property before and after the violations to all of the affected wetland acreage within Telluride Mountain Village to estimate the total increase in the value of property resulting from wetland fills," but providing no dollar amount.) I cannot properly evaluate the proposed consent decree on such meager information.

decree was negotiated in good faith and is fair. *Akzo Coatings,* 949 F.2d at 1435. Moreover, without consideration of these comments there is, essentially, no adversary presentation. *Cf. Pennsylvania Env. Defense Found. v. Bellefonte Borough,* 718 F.Supp. 431, 435 (M.D.Pa.1989) (court must consider government's comments on proposed consent decree in citizen suit under Clean Water Act; otherwise it "would be deprived of an adversarial presentation as to the propriety of approving the proposed consent decree.")

Over forty letters were received in this case. The writers include private individuals who live, work or recreate in San Miguel County, public entities and other organizations. Several are short and simply indicate the commentator's general agreement or disagreement with the proposed decree. Others, however, are detailed in their criticisms of the settlement and proposed remediation plan. By the government's own tally, twelve commenters favored the decree while thirty-four registered their opposition.

Of those letters indicating support for the decree, over half mention the need to construct a gondola on the ski mountain as the primary, if not the sole, reason I should approve the consent decree. The construction of the gondola is a public transportation project under the auspices of the Telluride Mountain Village Metropolitan District, an entity distinct from Telco. It is designed to reduce the amount of motor traffic on the narrow, winding mountain roads in the ski area. The project is stalled because it requires a permit authorizing the fill of a small area of wetlands. The Army Corps of Engineers will not issue the permit until it receives authorization from the EPA. The EPA, in turn, will not give its authorization until this case is resolved. One commenter, the Chairman of the San Miguel County Board of Commissioners, has indicated that, had the Metropolitan District's permit application not been linked to the resolution of

Telco's alleged violation, "the Town and County could be far more objective in commenting on whether the consent decree was an appropriate penalty for Telco's actions." (U.S.Mem.Br.Supp.Mot. Enter Consent Decree, Ex. C–18) (attaching letter to Mr. Grady McNure).

The need for the expeditious cleanup of an environmental violation can weigh in favor of approval of a proposed consent decree. *See, e.g., United States v. Seymour Recycling Corp.,* 554 F.Supp. at 1337, 1340–41. In this case, however, the desire to complete the gondola project quickly, before the next winter, is irrelevant to whether the proposed consent decree provides for appropriate penalties and remediation under the Clean Water Act. The propriety of the government's action in linking the issuance of a permit for the gondola project to resolution of its dispute with Telco is not a matter of immediate concern for me. I note only that the gondola project is an independent matter, involving different parties and distinct, though valid, concerns[2] which have little to do with whether the compromise in this case adequately compensates the public for the loss of wetlands occasioned by Telco's development.

On the other hand, public criticism of the proposed consent decree is strong and touches on many areas. The primary objections to the decree allege: (1) the civil penalty of $143,000 (plus completion of an additional project totalling $42,000), is less than the cost of an average lot in Telco's development and is not adequate to deter future Clean Water Act violations, (2) the government has ignored evidence that Telco's action was knowing, willful and perhaps criminal in light of its previous experience with wetlands permits,[3] (3) Telco is required to restore only 15.43 acres of wetlands at the ski area, despite estimates that approximately 45 to 47 acres were destroyed there, (4) the ratio of

2. If anything, construction of the gondola will require the destruction of additional wetlands, though it will bring benefits in the form of increased public safety and reduced motor vehicle pollution.

3. For example, in alerting EPA to the violation at issue, the Army Corps of Engineers advised EPA

that "[y]ou could interpret this case as a knowing, flagrant violation." (U.S.Mem.Br.Supp.Mot. Enter Consent Decree, Ex. C–36) (attaching letter to Dale Vodehnal). The government provides only minimal explanation why it has rejected this characterization.

destroyed wetlands to restored or mitigated wetlands, less than 1:1, is too low and provides no margin for failure,[4] (5) the restored wetlands will be located in sixteen scattered areas, many along the golf course, which will subject them to contamination by fertilizers, (6) the Menoken Farms mitigation project, located approximately 60 miles from Telluride and in a different county and watershed, is too distant and in an area with entirely different ecological conditions, and (7) the monitoring program for the mitigation project is inadequate, in that it requires Telco to maintain the project for a minimum of only three years.

The government's reaction to these unfavorable comments, with one exception, has been to dismiss them as unfounded. Only the objection relating to the selection of the Menoken Farms mitigation site has stirred the government to respond that it would "hold the motion to enter the consent decree in abeyance while the community is allowed a three or four month period to identify closer alternative viable mitigation sites," (U.S.Mem.Br.Supp.Mot. Enter Consent Decree at 9 n. 5), even though it criticizes the commenters for failing to identify any specific site for consideration. That criticism is haughty and unfair. Given the EPA's stated reliance on the expert hired by Telco for the development of the remediation plan because of its own limited resources, the government can hardly fault these commenters, several of whom have provided in-depth analyses of the proposed work plan, for failing to identify a better alternative.

### IV. *Conclusion.*

I deny the motion to enter the proposed consent decree. I am not confident that it is the product of good-faith negotiations through which the parties fully and carefully considered all possible alternatives. The decree was negotiated between the government and, for all practical purposes, a single defendant. The government relied on the defendant to develop much of the technical data upon which it relied in formulating the decree and remediation plan. As a result, it is less stringent in several respects than the

EPA's own policy advises and civil penalties are the minimum the EPA stated it would accept in settlement of the litigation.

For these reasons, I give only limited deference to the agency's judgment, and I rely more heavily on public comments to obtain a balanced view of the decree. These comments identify significant shortcomings, listed above, in the proposed remediation plan and cast doubt on the government's assessment of an appropriate penalty for the alleged violation. Therefore, I conclude that the proposed consent decree is not fair, reasonable and equitable and that it does not satisfactorily uphold the public's interest in protecting the Nation's waters.

IT IS ORDERED THAT the motion to enter consent decree is DENIED. The joint motion to expedite entry of the consent decree is DENIED as moot, and

IT IS FURTHER ORDERED THAT the provisions of D.C.Colo. LR 29.1 shall commence effective this date. On or before May 6, 1994, the parties shall meet and attempt to agree upon a scheduling order. A scheduling conference will be held in Denver, Colorado on May 27, 1994 at 9:15 a.m. in Courtroom C–504, and

IT IS FURTHER ORDERED THAT Defendants shall file answers to the complaint on or before May 11, 1994, and

IT IS FURTHER ORDERED THAT the required disclosures set forth in Fed.R.Civ.P. 26(a)(1) shall be provided on or before May 6, 1994, and

IT IS FURTHER ORDERED THAT all evidentiary hearings and trial shall be conducted at the United States Courthouse in Grand Junction, Colorado unless the Court is able to arrange for such hearings and trial to be held in suitable facilities in Telluride, Colorado.

---

4. Although during negotiations, the government accepted a compromise figure of 34 acres of destroyed wetlands, Telco's requirement under the consent decree to restore only 15.43 acres

on-site hardly "redresses a significant portion of Telluride's violations." (U.S.Mem.Br.Supp.Mot. Enter Consent Decree at 8.)