UNITED STATES of America, Plaintiff,

and

Commonwealth of Virginia,
Plaintiff–Intervenor,

v.

DISTRICT OF COLUMBIA, Defendant.

Civ. No. 96–669 (TFH).

United States District Court,
D. Columbia.

Aug. 2, 1996.

Robert Shapiro, Asst. U.S. Atty., U.S. Attorney's Office, Washington, D.C., Nancy Spencer, Environmental Enforcement Section, Department of Justice, Washington, D.C., for Plaintiff.

Arrobella W. Teal, Office of Corporation Counsel, Washington, D.C., for Defendant.

## *MEMORANDUM OPINION*

THOMAS F. HOGAN, District Judge.

Pending before the Court is plaintiff United States' Motion to Enter Stipulated Agreement and Order ("Agreement"). The Agreement was filed on April 5, 1996, and settles claims asserted in the United States' Complaint brought pursuant to Sections 309(b) and 104 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(b) and 1254, against the District of Columbia ("District") in connection with the Blue Plains Wastewater Treatment

Works Facility ("Blue Plains"). On July 1, 1996, the Court granted the Commonwealth of Virginia's ("Virginia") Motion to Intervene, made pursuant to Rule 24(a) of the Federal Rules of Civil Procedure and 33 U.S.C. § 1365(b)(1)(B). Virginia now opposes entry of the Stipulated Agreement. After carefully considering the parties' arguments, the Court will grant the United States' Motion to Enter the Stipulated Agreement.

## BACKGROUND

The District owns and operates Blue Plains which is located in the southwestern section of the city. Blue Plains processes and treats wastewater from the District, portions of Montgomery and Prince George's Counties, Maryland, and portions of Fairfax, Arlington, and Loudon Counties, Virginia.[1] The treated wastewater is discharged from Blue Plains into the Potomac River. These discharges are regulated by National Pollution Discharge Elimination System ("NPDES") Permit No. DC 0021199 ("Permit"). The Permit requires the defendant to properly operate and maintain Blue Plains, a requirement defined to include effective performance, adequate funding, adequate staffing and training, and adequate laboratory and process controls, including appropriate quality assurance procedures, and requires the operation and maintenance of backup or auxiliary facilities or similar systems when necessary to achieve compliance with the Permit. *See* Complaint at ¶ 18.

EPA's National Enforcement Investigation Center ("NEIC") inspected Blue Plains in April and November of 1995, and issued two reports, dated July 1995 and January 1996, respectively. After the first EPA inspection report identified problems at Blue Plains, the EPA issued an administrative order on August 30, 1996, pursuant to CWA Section 309(b), 33 U.S.C. § 1319(a), directing the District to correct the problems. When the District failed to address the problems satisfactorily, a second inspection followed. These inspections revealed numerous operation and maintenance deficiencies at Blue Plains including the diversion of at least $83

million from Blue Plains to other District uses. This Complaint followed.

This was not the first time that Blue Plains had run afoul of the law. The United States brought CWA claims against Blue Plains in 1984, which were settled by a consent decree entered by the court in 1985. Under the consent decree entered into on January 31, 1985, the District was required to comply with the terms of the Permit and to take remedial actions to rectify areas of neglect at Blue Plains. The United States sought enforcement of the decree in 1989 (pursuant to a motion alleging 1,854 violations of the decree), and brought additional claims in 1990, which were then settled in a second consent decree entered by the court in 1995. The District's conduct resulted in accrued stipulated fines in the amount of $3.1 million which the second consent decree subsequently reduced to $500,000 in negotiated fines. The 1995 consent decree differed in significant respects from the 1985 decree, in particular by not requiring the District to comply with the Permit. In neither of those instances did Virginia comment or seek to intervene.

As a result of the two latest reports issued by NEIC, Virginia prepared to file suit against the District under the CWA. According to Virginia, the diversion of no less than $96,060,208 of user fee revenues created a "crisis" at Blue Plains. The facility was short in staff as well as supplies, and the shortage of chemicals caused Blue Plains to suffer violations of effluent limits. The plant ceased preventive maintenance, and according to an October 1995 report to EPA, Blue Plains claimed to need $100 million in capital maintenance funds—notably, about the same amount as that which was allegedly diverted. All of these violations and shortages were violations of the Permit governing the operation of Blue Plains. As a result of these violations, by letter dated February 7, 1996, Virginia served notice of its intent to file suit under the CWA.

Instead, on April 5, 1996, the United States brought suit against the District pursuant to Sections 309(b) and 204 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(b) and 1284, and the implementing regulations

---

1. About 9% of the effluent sewage flow is from Virginia.

alleging violations of the CWA at Blue Plains.[2] The present claims arise primarily out of operation and maintenance deficiencies that the EPA discovered during the 1995 inspections and the diversion of at least $83 million of user charges for purposes other than Blue Plains. The Complaint sought injunctive relief on the basis of two claims: (1) failure to operate and maintain Blue Plains properly as required by the Permit, and (2) failure to comply with the requirement, contained in federal construction grants issued to the District pursuant to CWA Title II and the implementing regulations, to implement a user charge system that provides adequate funding for proper operation and maintenance of Blue Plains. According the United States, the thrust of the Complaint is prospective and preventive.

**Stipulated Agreement and Order**

In addition, on April 5, 1996, the United States filed with the Court a proposed Agreement settling the United States' claims against the District.[3] The United States claims that the Agreement is a fair and reasonable settlement of the limited claims the United States has brought and that entry of the Agreement will allow important preventive measures and capital improvements to be implemented without delay. The Agreement (or consent decree) is primarily injunctive in nature, and requires a series of capital projects that respond to specific operating and maintenance deficiencies identified in the NEIC reports. The Agreement includes detailed schedules for rehabilitation and maintenance of treatment equipment including nitrification sedimentation basins, sludge dewatering equipment, and chemical storage facilities, and requires the District to maintain chemical inventories necessary to treat wastewater. Agreement §§ I–V. In addition, the District is required to make timely payments on contracts necessary to operate and maintain Blue Plains, and to maintain $250,000 in contracting authority for supplies, materials, equipment and services for Blue Plains. Agreement §§ VII and VIII. The District is also required to make monthly reports to the EPA on compliance with these injunctive provisions. Agreement § XII.

The Agreement deals with the issue of diverted user fees in a more indirect fashion. The Agreement's failure to more aggressively address the issue of diversion of user charges appears to be based, at least in part, on the fact that user fees have recently been the subject of extensive legislation in the District. Blue Plains user charges are now required by law to be segregated. Under District Appropriation Bill, P.L. 104–134, 110 Stat. 1321, signed into law on April 26, 1996, the District is now required to establish an "Operation and Maintenance Account." This account is to be "used solely for funding the operation and maintenance of [Blue Plains] and may not be obligated or expended for any other purpose...." § 154(a)(2), P.L. No. 104–134, 110 Stat. 1321. The Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996, District Bill 11–111, to be codified at D.C.Code § 43–1661 et seq. calls for the creation of a Water and Sewer Authority to be formed for the administration of water supply and wastewater treatment services including Blue Plains. The effect of the creation of a Water and Sewer Authority will be to transfer direct control of Blue Plains away from the District.[4] Effective April 18, 1996,

---

**2.** The effect of the United States beating Virginia to the Courthouse was to bar Virginia from filing suit against the District separately. *See* 33 U.S.C. § 1365(b)(1)(B). Although notwithstanding who filed suit first it appears that a consent decree arising out of a suit bought by the EPA, even if that suit was filed subsequent to a citizen-suit, would result in dismissal of the citizen-suit. *See United States v. City of Green Forest*, 921 F.2d 1394, 1403 (8th Cir.1990), *cert. denied*, 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991).

**3.** After the Agreement was filed, notice of the settlement was published in the Federal Register,

61 Fed.Reg. 16265 (April 12, 1996), and public comments were solicited. The United States published notice of the proposed Agreement and received comments from the Commonwealth of Virginia and from two Blue Plains employees.

**4.** Although apparently this transfer of direct control will not be total. Under the present legislation six of the ten members are to be residents of the District, appointed with the advice and consent of Council and the Mayor will appoint the Chairperson. Water and Sewer Authority Establishment and Department of Public Works Reor-

the law requires that user charges be used only "for the maintenance of the District's supply of water and sewage systems." Finally, as for user charges that have been diverted in the past, the District has proposed in its Fiscal Year 1997 Budget and Multiyear Plan to restore these funds over a four-year period. Restoration in the amount of $83 million is to be made in equal payments beginning on October 1, 1997. The Agreement reserves the United States' right to seek an order requiring prospective segregation of user charges if the District's legislative solutions do not succeed or if in fact the District does not segregate the funds. The Agreement also provides that the United States may seek an order, not earlier than October 1, 1997, requiring the District to restore user charges that were directed to purposes other than Blue Plains in the event the District has not restored those funds in accordance with its fiscal year 1997 Budget and Multiyear Plan.

The United States maintains that the Agreement is a fair and reasonable settlement of the limited claims the United States is asserting here and that entry will address the most pressing problems identified by the EPA while protecting the environment during the transition to new management. Likewise, the United States points to the fact that the District has begun complying with the Agreement, improvements at Blue Plains are underway, and legislation has initiated the transfer of control of Blue Plains from the District to a Water and Sewer Authority.

**Virginia's Objections**

Virginia moved to intervene in the aforementioned case on the ground that the Agreement did not adequately protect its citizens' interests; on July 1, 1996, the Court granted that motion.[5] Virginia considers the

Agreement "unfair, inadequate to protect the Potomac River and not in the public interest." Virginia Comment at 1. Virginia claims that the Agreement in large part relies on the District to obey the law despite its "enduring lack of self control"—a reliance it deems misplaced in light of what it considers a long history of mismanagement of Blue Plains by the District coupled with tepid enforcement efforts by the EPA. According to Virginia, the District has been neglecting Blue Plains for over 16 years. At bottom, Virginia takes issue with the Agreement because it does not: (1) require repayment of misdirected funds, (2) forbid future misappropriation of dedicated funds, (3) forbid the neglect of other treatment units or maintenance activities, (4) require full staffing, (5) forbid the imposition of costs of the violations on the ratepayers, or (6) command the District to comply with the Permit. According to Virginia, the latest Agreement is merely a short term fix which does not address the long-term ills confronting Blue Plains.

## DISCUSSION

### I. Standard of Review

 In considering the proposed settlement the Court is required to assess whether it fairly and reasonably resolves the controversy in a manner consistent with the public interest. *See Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C.Cir.1983) "prior to approving a consent decree a court must satisfy itself of the settlement's 'overall fairness to beneficiaries and consistency with the public interest'" (*quoting United States v. Trucking Employers, Inc.*, 561 F.2d 313, 317 (D.C.Cir.1977)), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). Thus the function of the

---

ganization Act of 1996, D.C. Act. 11–201, §§ 204(a)(2) and 204(f).

5. Virginia's complaint asserts one claim pursuant to CWA § 505(b)(1)(B) based on the District's violation of Permit requirements. Virginia seeks an injunction (1) requiring the District to comply with the Permit terms, (2) prohibiting the use of sewer user revenues for purposes other than capital construction and operation of Blue Plains, (3) requiring an accounting of all sewer revenues from 1990 to the present, (4) requiring

the District to repay the Water and Sewer Utility Administration ("WASUA"), with interest, all sewer revenues appropriated for purposes other than Blue Plains, (5) requiring an accounting of all capital construction and operating and maintenance costs attributable to the uses of WASUA funds for other purposes, and (6) prohibiting the District from using sewer revenues to pay all increased capital construction and operating and maintenance costs caused by its use of sewer revenues.

reviewing court is not to substitute its judgment for that of the parties to the decree, but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy. *United States v. Hooker Chemicals and Plastics Corporation,* 540 F.Supp. 1067, 1072 (W.D.N.Y.1982), *aff'd,* 749 F.2d 968 (2d Cir. 1984). "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." 718 F.2d at 1124 (quoting *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 935 n. 10, 43 L.Ed.2d 148 (1975)).

■ How searching an inquiry the Court is required to make is another question altogether. "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." 718 F.2d at 1126. "[I]t is precisely the desire to avoid protracted examination of the parties' legal rights which underlies consent decrees." *Id.* And "[i]t is therefore inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial. Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted." *United States v. Microsoft Corporation,* 56 F.3d 1448, 1461 (D.C.Cir.1995). In particular, "when the government is challenged for not bringing as extensive an action as it might, a district judge must be careful not to exceed his or her constitutional role." *Id.* at 1462. Thus, the Court is not to "reach beyond the complaint to evaluate claims that

the government did not make and to inquire as to why they were not made." *Id.* at 1459.

■ That is not to say that the Court must stand by and approve any consent decree placed before it. Approval of a settlement is a judicial act that is committed to the informed discretion of the trial court, *Donovan v. Robbins,* 752 F.2d 1170, 1176–77 (7th Cir.1985), and the Court is not obliged to accept one that appears to make a mockery of judicial power. 56 F.3d at 1462. *See also Hooker Chemicals and Plastics Corporation,* 540 F.Supp. at 1072 ("The court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.") (*quoting City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974)).

■ Finally, broad deference should be afforded to EPA's expertise in determining an appropriate settlement and to the voluntary agreement of the parties in proposing the settlement. *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 118 (2d Cir.1992), (*citing, Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984)). Because the commencement of an enforcement action under the CWA is largely discretionary, settling that action is also within the EPA's discretion. *City of Green Forest,* 921 F.2d at 1402. In *Green Forest* the court went on to note that "the CWA 'was not intended to enable citizens to commandeer the federal enforcement machinery.' " *Id.* Under the CWA any affected citizen is permitted to intervene in a government action as a matter of right, *see* 33 U.S.C. § 1365(b)(1)(B), however, "if such a citizen were allowed to block entry of a consent decree merely by objecting to its terms it would wreak havoc upon government enforcement actions." *United States v. Ketchikan Pulp Co.,* 430 F.Supp. 83, 85 (D.Ala.1977). Moreover, "[i]t is well settled that 'the right to have its objections heard does not, of course, give the intervenor the right to block any settlement to which it objects.' " *Hooker Chemicals and Plastics Corporation,* 540 F.Supp. at 1083 (*quoting*

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 390–94, 102 S.Ct. 1127, 1131–32, 71 L.Ed.2d 234 (1982), (*quoting Air Line Stewards and Stewardesses Ass'n v. Trans World Airlines*, 630 F.2d 1164, 1169 (7th Cir.1980))).

It is against this backdrop that the Court reviews whether the Agreement is fair, reasonable and consistent with public policy.

## II. Fair, Reasonable and Consistent With Public Policy

### A. Is the Agreement Fair?

 A review of the fairness of a proposed consent decree requires an assessment of the good faith of the parties, the opinions of the counsel, and the possible risks involved in litigation if the settlement is not approved. *United States v. Hooker Chem. & Plastics Corp.*, 607 F.Supp. 1052, 1057 (W.D.N.Y.), *aff'd*, 776 F.2d 410 (2d Cir.1985). "Fairness incorporates both procedural and substantive components." *United States v. Telluride Co.*, 849 F.Supp. 1400, 1402 (D.Colo.1994). An assessment of procedural fairness involves looking "to the negotiating process and attempt[ing] to gauge its candor, openness, and bargaining balance." *Id.* A consent decree that is substantively fair incorporates "concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible." *Id.* (*quoting United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir.1990)).

Naturally, the United States argues that this Agreement is fair. According to the United States, the Agreement was reached as a result of good faith, arms-length negotiation, reflecting a "careful and informed assessment of the merits of the government's claims, the costs, risks, and delays that litigation would entail, and the benefits of an early settlement, including the environmental benefits that will accrue from immediate implementation of the injunctive measures contained in the Agreement." United States' Motion to Enter at 14–15.[6] The United States urges the Court to assess fairness in the context of the effect of the settlement on other parties. Because the Agreement ensures that immediate steps will be taken to fix operational and maintenance deficiencies at Blue Plains, the environment will be protected and thus the Agreement is fair in this respect. Moreover, the United States asserts the rights of third parties such as Virginia are protected because the Agreement does not foreclose it or any other ratepayer from seeking monetary damages for past use of user charges for purposes other than Blue Plains. In fact, the Agreement reserves the right of the United States itself to seek such relief, including prospective segregation of user charges, and to seek repayment of the previously diverted user charges in the event the District does not comply with recently enacted legislation which is intended to address that issue. Agreement at § XVII, ¶ 3. The Agreement does not preclude citizen-suits for different violations nor does it attempt to preclude citizen-suits to force EPA to enforce the decree. 430 F.Supp. at 87.

Conversely, Virginia asserts that the Agreement was not reached in an arms-length negotiation but instead "bespeaks collaboration." Alleging that the present Agreement repeats the mistakes of the 1995 consent decree by failing to address the particular problems discovered by the NEIC or the pattern of decree violations, Virginia asserts that the discussions between the United States and the District lacked the "adversarial vigor" necessary to ensure substantive fairness. Finally, Virginia argues that the Agreement is substantively unfair because it leaves ratepayers to fend for themselves at least with regard to user fees.

Virginia's assessment of the fairness of the Agreement is unfortunately colored by what it perceives to be the shortcomings in the complaint brought by the United States. At bottom, that is the essence of Virginia's entire challenge to the consent decree—that it does not go far enough. Put another way, Virginia's challenge to the Agreement is that it fails to sufficiently punish the District. Virginia's allegations as to the District's

---

6. Moreover, the mere failure to include the Commonwealth in these negotiations does not in and of itself render the Agreement procedurally unfair. Negotiations on the latest consent decree between EPA, the Department of Justice ("DOJ") and the District began in December 1995, prior to Virginia's notifying EPA of its intent to bring suit.

"misdeeds" are based upon the diversion of approximately $96 million, part of which came from Virginia ratepayers—which it claims has resulted in a dangerous environmental situation. However, as this circuit's decision in *Microsoft* makes clear when a party is essentially claiming that the government did not bring as extensive action as it might, the Court should be careful "not to exceed his or her constitutional role." 56 F.3d at 1462. The Court is not to "reach beyond the complaint to evaluate claims that the government did not make and to inquire as to why they were not made." 56 F.3d at 1459. But this is really what Virginia would like this Court to do.

Virginia makes some conclusory allegations regarding the collaborative nature of the relationship between the United States and the District. However, these allegations are belied by the fact that the United States has now filed claims against the District three separate times since 1985, which have resulted in two separate consent decrees and the imposition of at least $500,000 in civil fines. The EPA appears to be a regular visitor to Blue Plains—and such visits can hardly be characterized as social. There is simply insufficient evidence before the Court to conclude that the relationship between the United States and the District regarding Blue Plains was cozy or collaborative. Nor does the mere fact that Virginia was not included in the negotiations when it was not a party prove that the Agreement is itself unfair. Both the EPA and DOJ met with representatives from Virginia to discuss its concerns. Most important, before Virginia can establish unfairness arising out of its exclusion from negotiations, it must establish its entitlement to attend such meetings. That has simply not been done.

Virginia misperceives the Court's function in assessing fairness. While the most recent Agreement was not the result of long drawn out negotiations arising from a hotly disputed adversarial process, the two parties to this dispute have been litigating Blue Plains issues since essentially 1984. Thus, this consent decree differs from the decree filed simultaneously with the complaint found wanting by the court in *Telluride*. 849 F.Supp. at 1403. When Virginia's claims are stripped to their bare essentials, what is left is Virginia's objection to the scope of the punishment. The EPA discovered diversion problems and operational deficiencies; the former perhaps causing the latter. However, the record before the Court suggests that the problems resulted in "limited effluent limit violations." In other words, while there appear to be serious problems at Blue Plains, so far these problems have not resulted in a significant amount of environmental damage.[7] Thus, Virginia apparently seeks to punish the District not for environmental damage done here but for what it deems to be sixteen years of mismanagement. Understandably because Virginia believes its citizens' money was, in effect, stolen, and the potential pollution that the theft could have caused directly affects its citizens, it wants retribution. But such a concept of what is fair is far afield from the fairness inquiry that this Court is required to make.

In the context of the CWA, where the government is entrusted to act on behalf of its citizens,[8] the question becomes whether the Agreement that the government struck for those citizens is fair to those citizens. Notably, despite its status as a sovereign, Virginia comes to this Court as a citizen—no more, no less. Applying that standard, this Agreement is fair. As *Telluride* notes, "the need for the expeditious cleanup of an environmental violation can weigh in favor of approval of a proposed consent decree." 849 F.Supp. at 1405. Here, the Agreement takes quick, concrete steps to prevent further diversion and correct the deficiencies. In other words, the Agreement achieves these limited objectives

---

7. The Court does not seek to minimize the apparent serious problems at Blue Plains but only to point out that this case differs from those like *Telluride* which involved serious damage to environment. *See* 847 F.Supp. at 1405–06 (approximately 45–47 acres of wetlands were destroyed yet the decree only required restoration of 15 acres).

8. "The EPA is charged with enforcing the CWA on behalf of all of its citizens." 921 F.2d at 1404.

and contemplates repayment of the diverted user charges.

Nor is the Court convinced that the Agreement is not fair simply because it does not require repayment of user charges that the District used in the past for other purposes. Recent legislation enacted by the District and approved by Congress requires the District to segregate the user funds into an account to be used solely for Blue Plains. Moreover, the creation of the Water and Sewer Authority that will run Blue Plains restricts user charges to use for Blue Plains. The evidence before the Court suggests that the Agreement's failure to specifically require repayment of the diverted user fees arose out of recognition of the District's intent to repay the user charges over a four-year period. The Agreement reserves the right of the United States to seek restoration if the District is not proceeding with the scheduled restoration.

Any focus on fairness must address this Complaint and Agreement alone. This Court is well aware of the serious ramifications of a federal court involving itself in the management of a branch of the local government. However, the question of how Blue Plains should be run is not before this Court—yet. Accordingly, the Court will restrict its consideration to what is actually before the Court. Under this standard, the Agreement is fair.

### B. Is the Agreement Reasonable?

In examining the reasonableness of a decree there are three factors for the Court to consider: (1) whether the decree is technically adequate to accomplish the goal of cleaning the environment, (2) whether it will sufficiently compensate the public for the costs of the remedial measures, and (3) whether it reflects the relative strength or weakness of the government's case against the environmental offender. *Telluride*, 849 F.Supp. at 1402; *see also Cannons Eng'g*, 899 F.2d at 89–90.

The United States argues that the Agreement is reasonable because it contains specific, tailored relief that addresses the deficiencies found in the EPA reports. According to the United States, the Agreement is intended to solve limited discrete problems recently identified at Blue Plains, and that recent legislative measures are intended to provide more comprehensive solutions to the overarching problems. The United States maintains that because the situation at Blue Plains was so serious, it demanded an immediate response, and the type of broad comprehensive relief sought by Virginia would be inconsistent with such a result. Contrary to Virginia's protestations, the United States maintains that its enforcement efforts at Blue Plains have succeeded, not failed. On account of EPA's vigilant inspection and discovery of problems at Blue Plains this complaint and Agreement were filed. Moreover, the injunctive measures in the Agreement are intended to prevent future harm.

Conversely, Virginia argues that the Agreement is not reasonable because it extinguishes the District's liability for past violations without obtaining any assurances regarding future violations. Put bluntly, Virginia maintains that the District cannot be trusted and considers any Agreement which calls on the District to in large part police itself, to be unreasonable on its face. Viewed in light of the District's historic inability to comply with the law, or obey consent decrees in this case and others, or the orders of various courts, Virginia's skepticism regarding the District's ability to comply with its own laws is not wholly unfounded. This most certainly is the primary factor driving Virginia to seek greater protection for its citizens—and who can blame them? However, the basic premise of Virginia's entire thesis, taken to its logical conclusion, is a difficult one for this Court to adopt in this posture—that is, that the District of Columbia should not be trusted to obey its laws. For the Court to agree with Virginia, taking that premise to its logical conclusion, would require implicitly adopting a standard that could potentially prevent the District from ever being party to a consent decree.[9]

9. There are other reasons which cause the Court to take pause. First, while Virginia spends a

great deal of effort pointing out the shortcomings of the 1995 consent decree—that decree is not

The role of this Court in assessing this consent decree is not to impose its own judgments as to how it would prosecute and resolve a particular case. Nor for that matter is it Virginia's right to have the case litigated in the manner it would choose. The question for the Court is whether the Agreement is reasonable from an objective point of view. Applying the standards enunciated in *Telluride*, it appears on this record that the Agreement is technically adequate to accomplish the goal of cleaning the environment. The Agreement includes short and long term equipment improvements; in particular, detailed schedules for rehabilitation and maintenance of treatment equipment including nitrification sedimentation basins, sludge dewatering equipment, and chemical storage facilities, and requires the District to maintain chemical inventories necessary to treat wastewater. In addition, the District is required to make timely payments on contracts necessary to operate and maintain Blue Plains, and to maintain $250,-000 in contracting authority for supplies, material and equipment. Finally, the District is required to make monthly reports to the EPA on compliance with these injunctive provisions.

As to whether it will sufficiently compensate the public for the costs of the remedial measures, the United States has made a conscious decision not to seek civil penalties because in its judgment much of what has occurred here is a result of the District's well known financial crisis. This decision is for the United States alone to make. Moreover, the legislation recently passed by the District requires that the funds which were diverted be repaid over a four-year period and reserves the United States' right to step back in if this is not done.

The final step in the reasonableness inquiry is whether the Agreement reflects the relative strength or weakness of the government's case against the District. There appears to be little dispute regarding the relative culpability of the District. It has violated the law numerous times as well as disregarded the two previous consent decrees under which it has been forced to operate. The only issue then is whether the limited remedies that the United States seeks to impose upon the District are adequate. Virginia says no, but offers little support for the position that the United States abused its discretion in reaching its decision to impose only injunctive relief. The United States is correct when it states, in effect, that the Agreement is not intended to remedy (or punish) 16 years of conduct. Putting aside Virginia's claim that the District cannot be trusted to obey the law, there is no suggestion in the Agreement that the EPA or the DOJ has consented to abdicate its responsibility to enforce the law.

The question for the Court is whether the Agreement reflects the relative strength of this case as it is laid out in this complaint. While it is true that the Agreement may have extracted less than was possible from the defendant, it must be remembered that a consent decree by its very nature will contain elements of compromise. *Ketchikan Pulp Co.*, 430 F.Supp. at 87. According to the United States, the District maintains that the United States is not entitled to an Order requiring it to restore the funds it allegedly diverted. It is almost axiomatic that voluntary compliance on an issue where there is a potential disagreement is a better alternative than the uncertainty of litigation over that issue. Despite serious problems, the latest EPA reports suggest there has been minimal pollution, and the United States' stated goal is to quickly fix those problems which might lead to a *future* problem. Accordingly, its choice of prospective injunctive relief is a reasonable one.

## C. Is the Agreement in the Public Interest?

The United States maintains that because the Agreement is consistent with the pur-

before the Court. Second, each case is different and should be treated differently. The United States is generally correct when it urges the Court to look at this consent decree independent of the two previous consent decrees between

these parties. Likewise, the Court will not impute to the District, in this case, its well documented behavior and conduct which has occurred in other cases.

poses of the CWA, which are "to restore and maintain the chemical, physical and biological integrity of the Nation's waters," it serves the public interest and produces environmental benefits quickly "without litigation, delay or costs." *See* CWA Section 101(a), 33 U.S.C. § 1251(a). Virginia, on the other hand, argues that because the Agreement does not require Permit compliance or forbid/punish the behavior of the last 16 years, it is inconsistent with the public interest. Moreover, Virginia asserts that the Agreement fails to incorporate "concepts of corrective justice and accountability," because it does not seek to impose large civil penalties or criminal charges. Virginia's challenges regarding the Agreement are largely based on the United States' failure to pursue criminal claims or larger civil penalties.

■ In the Court's view the terms of the Agreement contribute to the restoration and maintenance of the chemical, physical, and biological integrity of the nation's water. Presently there is every indication that Blue Plains is in compliance with the Agreement. Might there be more to be done at Blue Plains—perhaps; would this Court have taken a harder line with the District in light of the District's track record—maybe. However, the Agreement, if complied with, while not solving every problem makes significant progress. In *Microsoft Corp.*, 56 F.3d 1448, the court cautioned that the District Court's role in approving a settlement was to evaluate whether the settlement was a fair resolution of the claims actually asserted. The decision of the United States to seek only civil injunctive relief is one within the prosecutorial discretion of the United States.

## CONCLUSION

A "court fulfils its responsibilities [ ] simply by determining that the settlement is consistent with the statute the consent judgment is to enforce and fairly resolves the controversy in a manner consistent with the public interest." *Citizens for a Better Environment,* 718 F.2d at 1128. At the heart of every successful consent decree is the willingness of its parties to live by its terms. As previously discussed, the evidence in the record suggests that the District has already begun complying with the Agreement. Because the Court finds that the Agreement is fair, reasonable and in the public interest, it will grant the motion of the United States to enter the decree.

## *ORDER*

Pending before the Court is plaintiff United States' Motion to Enter the Stipulated Agreement and Order. After carefully considering the parties' briefs and the arguments contained therein, the Court finds that the Agreement is fair, reasonable and in the public interest. Accordingly it is hereby

ORDERED that Motion to Enter is GRANTED; and it is further

ORDERED that the Agreement is ENTERED.