USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1752

 UNITED STATES OF AMERICA,

 Plaintiff, Appellee,

 v.

 COMUNIDADES UNIDAS CONTRA LA CONTAMINACION,

 Plaintiff-Intervenor, Appellant,

 v.
 
 PUERTO RICO ELECTRIC POWER AUTHORITY,
 
 Defendant, Appellee.
 
 
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF PUERTO RICO
 
 [Hon. Carmen Consuelo Cerezo, U.S. District Judge]
 
 
 
 Before
 
 Selya, Circuit Judge,
 Coffin and Campbell, Senior Circuit Judges.
 
 
 
 
 Ana L. Toledo for appellant.
 Mark R. Haag, Attorney, Department of Justice, Environment &
Natural Resources Division, with whom Lois J. Schiffer, Assistant
Attorney General, Peter Flynn and Andrew Mergen, Attorneys,
Department of Justice, Environment & Natural Resources Division
were on brief for the United States.
 Melissa H. Maxman with whom Sandra A. Jeskie, Lawrence W.
Diamond, Marco A. Gonzalez, Terry Philip Segal, Richard M. Wong,
and John Uphoff-Figueroa were on brief for Puerto Rico Electric
Power Authority.

February 25, 2000

 
 

 COFFIN, Senior Circuit Judge. This is an end note to wide-
ranging, lengthy, and technically complex litigation begun in 1993
by the United States against the Puerto Rico Electric Power
Authority (PREPA) for violations of some five federal environmental
statutes committed at its four electric generating power plants and
one transmission center. The two parties finally succeeded in
negotiating an agreement that was converted by district court
approval into a consent decree in 1999. 
 In the course of the proceedings, an organization named
Comunidades Unidas Contra la Contaminacion (CUCCo), representing
the inhabitants of Catano, a center of concentration of various
industrial facilities and two of PREPA's plants, felt that its
interests were not being sufficiently protected and successfully
sought intervention as a party in 1996. Although denied an
evidentiary hearing, it submitted voluminous comments addressing
flaws in the proposed consent decree. Many of its comments, which
fell under the Clean Water Act, were accepted in the decree's final
version, but CUCCo's request for counsel fees was summarily denied.
 The issues raised by CUCCo on appeal are: (1) whether the
district court erred in refusing to hold an evidentiary hearing on
the adequacy of the decree; (2) whether it erred in failing to
state reasons why it deemed the decree to be fair, reasonable, and
consistent with the objectives of the relevant legislation; and (3)
whether the court erred in denying counsel fees to CUCCo. 

 I. Factual Background
 A brief synopsis of the case, insofar as is relevant to these
issues, is as follows. The government's suit charged PREPA's four
plants and its transmission center with violating air quality and
emissions limitations of the Clean Air Act, 42 U.S.C. 7401-7431;
Clean Water Act National Pollutant Discharge Elimination System
requirements, 33 U.S.C. 1311, 1342, and oil pollution
regulations, 33 U.S.C. 1321; various reporting requirements
relating to hazardous substances required by the Emergency Planning
and Community Right-to-Know Act, 42 U.S.C. 11004, 11022, and the
Comprehensive Environmental Response, Compensation, and Liability
Act (CERCLA), 42 U.S.C. 9603; and underground storage tank
requirements of the Resource Conservation and Recovery Act, 42
U.S.C. 6991b. Civil penalties and injunctive relief were sought.
 By 1995, negotiations between the United States, through the
Environmental Protection Agency (EPA), and PREPA had evolved such
that the parties urged the district court to revise the litigation
schedule to focus on settlement. A year later, in April of 1996,
unsatisfied with the progress, CUCCo moved to intervene and
participate in settlement negotiations. The district court granted
the motion to intervene, reserving a decision as to the extent of
intervention to be allowed.
 In January of 1997, the United States filed a proposed consent
decree, which contemplated settlement of all of its claims and
included compliance schedules, civil penalties, and environmental
improvement projects. CUCCo objected immediately and sought
rejection, because it had not been allowed to participate in the
negotiations. The court, on February 7, 1997, denied the motion,
indicated that CUCCo should submit its comments during the public
comment period, and added that CUCCo, having been granted
intervenor status, was more than "a mere spectator," and, if any of
its concerns remained unanswered after conclusion of the public
comment process, there would be an "opportunity to raise its
objections directly before the Court at an evidentiary hearing to
be scheduled, if and when the need arises." Shortly thereafter,
in response to a government motion for clarification, the court
said that its final decision regarding an evidentiary hearing was
within its discretion--in other words, it would "allow the
opportunity for a hearing if fairness requires it."
 An expanded period of 140 days for public comment then
followed, which ended on June 25, 1997, and drew only 5 commentors. 
CUCCo submitted over 50 pages of comments on Clean Air Act issues,
among other commentary, together with attachments of 700 pages; its
expert, Servicios Cientificos y Tecnicos, submitted on CUCCo's
behalf a 23 page study addressing Clean Water Act issues; the
United States Fish and Wildlife Service made largely the same
points as Servicios; one individual took a position diametrically
opposed to CUCCo, arguing that the proposed decree was too severe
in requiring a sulfur limitation for boiler emissions of 1.5%; and
another individual simply endorsed the Land Acquisition Project to
acquire and preserve a parcel of ecologically vulnerable land in
the Catano area. 
 Thereupon, the United States and PREPA undertook to consider
the comments and renegotiate. There were meetings, telephone
conferences, and correspondence with CUCCo and others. Technical
personnel, explanatory material, and documents were made available. 
CUCCo's comments, challenging the decree's Clean Air Act compliance
provisions, the Land Acquisition Project, the settlement process,
community participation, and refusal to lower the sulfur content of
boiler fuel to 0.5% by weight were addressed and rejected in an EPA
response of some 55 pages. 
 The submission of Servicios Cientificos y Tecnicos on behalf
of CUCCo, however, received a largely favorable response of 21
pages with an 18 page tabular attachment from EPA. Servicios,
addressing Clean Water Act issues, had made the point that a large
number of interim thermal discharge effluent limits were too high. 
In many instances, for example, PREPA's plants had already reduced
the effluent discharge below the proposed interim limits which were
to govern until the final limits became applicable. EPA agreed
that a number of interim limits were not restrictive enough. It
had begun to review these limits shortly after receiving the oral
comments that followed the lodging of the proposed decree and had
effected "often significant reductions of maximum allowable
effluent discharge during the 'interim' period prior to the time
when final compliance with the underlying NPDES permit is
required." 
 EPA agreed that blind adherence to a particular statistical
method was unwise and that its approach must be tempered by the
best engineering and scientific judgment. It eliminated, as
unfairly affecting a limits determination, high data points for
which there were no explanation. It included, as urged, newly
available data for 1996, and it eliminated interim limits more
lenient than the existing underlying permit limits. It also
pointed out that, by the time the revised interim limits had been
negotiated and included in the proposed final decree, they would
apply for only a limited time, expiring for the most part in April
1999. There was, however, one important exception: the interim
limits for such discharges at the San Juan plant would be effective
indefinitely, subject to later statutory proceedings relating to an
application for waiver.
 In sum, of the 81 interim effluent limits appearing in the
initial proposed consent decree, 18 were eliminated entirely, while
46 of the remaining 63 were made more stringent, "often
substantially so," mainly due to the comments of Servicios
Cientificos y Tecnicos.
 On February 10, 1998, the United States presented and moved
for the approval of the revised consent decree. Its filings
included a substantial memorandum in support of approval, the 158
page decree, and over 200 pages of attachments. It contained a
civil penalty of $1.5 million for past violations, $3.5 million for
the acquisition of ecologically sensitive lands and training fire
department personnel in dealing with hazardous materials, and
injunctive relief covering air quality, water quality, oil spills,
hazardous chemicals, CERCLA issues, care of underground storage
tanks, and the services of an environmental review contractor. The
decree also recited, on its second page, "the Parties agree and
this Court finds that this Consent Decree has been negotiated by
the Parties in good faith, that implementation of this Consent
Decree will avoid prolonged and complicated litigation between the
Parties, and that this Consent Decree is fair, reasonable, and in
the public interest."
 After further exchanges between the government and CUCCo,
addressing the latter's continuing concerns, and no change of
position, CUCCo again moved for an evidentiary hearing in April of
1998. In November of 1998, the United States moved for immediate
entry of the decree and on March 16, 1999, the district court
ordered, in the margin of the motion, that the decree be filed,
noting, "It will be signed and entered as a final judgment
immediately." On March 19, the court signed the decree. The court
also denied as moot CUCCo's latest request for an evidentiary
hearing and denied without opinion CUCCo's application for
attorney's fees and costs.
 II. Was an Evidentiary Hearing Mandated?
 In addressing the refusal of the district court to grant an
evidentiary hearing, we are constrained to a review for abuse of
discretion. As we said in United States v. Cannons Engineering
Corp., 899 F.2d 79 (lst Cir. 1990), the key consideration is
whether there has been "'a fair opportunity to present relevant
facts and arguments to the court, and to counter the opponent's
submissions.'" Id. at 93 (quoting Aoude v. Mobil Oil Corp., 862
F.2d 890, 894 (lst Cir. 1988)). We cannot say here that CUCCo,
having presented its own substantial comments, which were seriously
considered and adopted to the extent that they regarded Clean Air
Act issues, and having had further opportunity to meet and confer
with the negotiating parties and to present its views at several
stages to the court, was denied this opportunity.
 Recently we acknowledged the reality of this type of broad,
technologically driven litigation, when we observed in United
States v. Charles George Trucking, Inc., 34 F.3d 1081 (lst Cir.
1994), that "requests for evidentiary hearings are, for the most
part, routinely denied--and properly so--at the consent decree
stage in environmental cases." Id. at 1085. CUCCo would discount
this teaching on the ground that Charles George dealt with the
issue of allocating monetary responsibility for the remedial clean-
up of polluted areas in a CERCLA case, whereas the instant case is
concerned with health hazards and future protection of the
environment. But we do not see the principle as so confined. Our
reliance in Charles George on United States v. Metropolitan St.
Louis Sewer District, 952 F.2d 1040 (8th Cir. 1992), a case brought
under the Clean Water Act, is indicative of this judgment. In that
case the court stated that, once intervenors had the opportunity to
file objections, there was little else that could be done. See id.
at 1044 (citing United States Envtl. Protection Agency v. City of
Green Forest, 921 F.2d 1394, 1402 (8th Cir. 1990)). 
 A reality check makes clear why there can be no unconditional
right to an evidentiary hearing in such cases as this. Here, the
two parties, the United States and PREPA, had been negotiating for
three years, more intensely during the third year. Whether or not
the pace had been sluggish, they had finally arrived at agreement
over a host of issues. They were for the most part exceedingly
technical and required the use of scientific or engineering data
and statistics. To allow evidentiary hearings on the call of any
party allowed to intervene would delay, complicate, and perhaps
jeopardize the timely resolution of the issues. After all, the
decree to be approved was a consent decree; sophisticated adverse
parties, represented by their top professionals in dealing with
environmental problems, had found common ground. 
 CUCCo urges us to seize on statements favorable to hearing the
objections of intervenors alluded to in Local Number 93,
International Ass'n of Firefighters v. Cleveland, 478 U.S. 501
(1986). The statement of the Court that an intervenor has the
right to introduce evidence at a hearing on a decree merely
referenced the statutory right of an affected person in an
employment discrimination case to present objections to a judgment. 
See id. at 529. If there were a hearing, such a person would have
the right to be heard. But this is not the same as guaranteeing an
evidentiary hearing on demand. The Cleveland Court's citation of
Kirkland v. New York State Department Of Correctional Services, 711
F.2d 1117 (2d Cir. 1983), is enlightening, for that case held only
that intervenors in race discrimination cases have a sufficient
interest to argue that the decree is unreasonable. See id. at
1126. The opportunity to object or to argue is not translatable
into an unconditional right to have an evidentiary hearing. In any
event, we are constrained by our own more recent precedent, namely,
Charles George, applicable to this kind of case. See Metcalf &
Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth., 991 F.2d 935,
939 n.3 (lst Cir. 1993) ("In a multi-panel circuit, newly
constituted panels, generally speaking, are bound by prior panel
decisions on point.").
 CUCCo has a more particularistic argument: that the district
court unequivocally promised it an evidentiary hearing. But, as
the passages of the court's two orders we have quoted reveal, the
court couched its promise with the caveat that a hearing would be
vouchsafed "if need arises" or "if fairness requires." This seems
only a sensible reservation; a court would not likely undertake to
abandon the exercise of all future discretion. We do not believe
the court abused its discretion in later determining that there was
no need for an evidentiary hearing.
 III. Is the Lack of Reasoned Judgment Fatal to the Decree?
 A more troubling argument advanced by CUCCo is that the
district court did not set forth its own grounds for finding that
the consent decree was fair, reasonable, and in the public
interest, and that it did not set forth reasons why CUCCo's
objections were misplaced. The district court, according to CUCCo,
merely signed the decree, ordering it to be entered. In so doing,
CUCCo argues, the court abrogated its responsibility to make an
independent judgment.
 There is no question but that a consent decree must bear the
imprimatur of a judicial judgment that it is fair, adequate,
reasonable, and consistent with the objectives of Congress. See
Conservation Law Found. v. Franklin, 989 F.2d 54, 58 (lst Cir.
1993). The United States, PREPA, and CUCCo all accept this set of
standards. Thus there is no allegation that an error of law has
been committed by the district court. Rather, the question is
whether the record contains adequate facts to support the decision
of the district court to approve the proposed compromise. As to
this, as the Supreme Court has observed, "a reviewing court would
be properly reluctant to attack that action solely because the
court failed adequately to set forth its reasons or the evidence on
which they were based." Protective Comm. for Indep. Stockholders
of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 437 (1968).
 As the United States acknowledged in its brief in an
understated manner, "an explanation may have been advisable." We
grant that a judge confronted with such a multi-faceted, technical,
voluminous document, agreed to by two sophisticated and resourceful
adversaries, faces what is on the surface a dilemma between
essaying an exhaustive and detailed appraisal and contenting
herself with rehearsing a brief and conclusory litany. We say "on
the surface" because a judge who has lived with litigation spanning
such a long time will perceive a middle course suggested by the
history of the case. The judge will know the major issues that
have been contested and resolved, will be acquainted with the
evidence for and against resolutions achieved, and can indicate a
basis for confidence that they lie within the area of permissible
discretion. This gives a reviewing court confidence that a neutral
adjudicator, intimately acquainted with the case, has focused on
the essential criteria and found them not lacking.
 Having said this, we are most reluctant, however, to further
extend these proceedings unless we sensed something deeply amiss. 
The proceedings lasted over five and one half years. The court had
the benefit of an initially proposed decree in 1997. Then it had
the second proposed decree, its attachments, including all comments
and responses thereto, and the government's memorandum accompanying
its motion to enter. It withheld action on the decree for over a
year while the United States and CUCCo further conferred.
 The decree was finally endorsed by the court on March 19,
1999. As we have noted, a prominent introductory section recited
that
 [T]he Court finds that this Consent Decree has been
 negotiated by the Parties in good faith . . . and that
 this Consent Decree is fair, reasonable, and in the
 public interest.

We must presume that the court was fully cognizant of this solemn
representation of its conclusions. Moreover, any further
proceedings would cause the loss or delay of the benefits of the
$3.5 million civilian penalty, construction timetables, interim
discharge limitations, stipulated penalty provisions, and work on
the environmental projects contained in the decree.
 At this point we underscore two policies that heavily brigade
the decree. The first is the strong public policy in favor of
settlements, particularly in very complex and technical regulatory
contexts. See Conservation Law Found., 989 F.2d at 59. Moreover,
such a policy has added bite where the settlement has been advanced
for entry as a decree by a government actor "committed to the
protection of the public interest" and specially trained and
oriented in the field. See Cannons Eng'g Corp., 899 F.2d at 84.
 But the conclusory recitation in the decree, even viewed in
conjunction with the high degree of deference owed to contracting
parties in this kind of case, still leaves us without a more
reasoned judicial determination. We therefore choose a route
rarely taken; we examine the record ourselves to see if we can find
that the decree is fair, reasonable, and consistent with
environmental goals. We are in essentially the same position as
the court in Van Horn v. Trickey, 840 F.2d 604 (8th Cir. 1988),
where the district court, in approving a class action prison reform
settlement, did not address the fairness, reasonableness, or
adequacy of the arrangement. The appeals court found that the
record contained enough facts to support the district court's
approval of the settlement. See id. at 607. 
 We therefore scrutinize the record. We accept as our standard
the precept reiterated in United States v. Hooker Chemicals and
Plastics Corp., 540 F. Supp. 1067 (W.D.N.Y. 1982), aff'd, 749 F.2d
968 (2d Cir. 1984), that "'[t]he court must eschew any rubber stamp
approval in favor of an independent evaluation, yet, at the same
time, it must stop short of the detailed and thorough investigation
that it would undertake if it were actually trying the case.'" Id.
at 1072 (citation omitted). Our review lacks the sense of command
and "feel" of a complex case that a managing court would have. But
we shall focus on each basic criterion and seek for sufficient
record evidence to give us confidence that it is adequately
supported.
 Addressing the fairness of the decree, we have seen no
evidence that the United States and PREPA had other than an arm's
length, good faith bargaining record. We say this, while
acknowledging that CUCCo has charged PREPA with being the "worst-
run utility" and the United States as a "look-the-other-way"
plaintiff. As with many other charges levied, this lacks
specifics, not to mention record references. Indeed, CUCCo's
charges are reminiscent of Virginia's objections to the decree in
a case cited by CUCCo, United States v. District of Columbia, 933
F. Supp. 42 (D.D.C. 1996), namely, that the parties lacked
"adversarial vigor" and that many years of mismanagement warranted
much larger fines than those proposed in the decree. See id. at 48-
49.
 A second aspect of fairness is its substantive side, what we
have characterized as "concepts of corrective justice and
accountability: a party should bear the cost of the harm for which
it is legally responsible." Cannons Eng'g Corp., 899 F.3d at 87. 
But these concepts do not lend themselves to verifiable precision. 
In environmental cases, EPA's expertise must be given "the benefit
of the doubt when weighing substantive fairness." Id. at 88. 
Here, the present and continuing burdens laid on PREPA, both in
monetary penalties and in performance requirements are very
substantial. We have examined all of EPA's responses to CUCCo's
comments and have found them persuasive.
 As for adequacy and reasonableness, we have surveyed the
plethora of compliance requirements, qualitative standards, and
ongoing monitoring and reporting devices incorporated in the
decree. Most of these, in fact, have been supported by CUCCo
which, at one point, sought to bring about a partial enforcement of
the decree. Again, we see similarities between this decree and
that approved in District of Columbia: "tailored relief" covering
short and long term equipment improvements, detailed schedules,
required contractual obligations, reporting requirements, etc. See
District of Columbia, 933 F. Supp. at 50-51. Indeed, in District
of Columbia, the United States had made a "conscious decision not
to seek civil penalties." Id. at 51. 
 CUCCo's major technically based objections are that it was not
reasonable to allow PREPA to use fuel with a 1.5% sulfur content in
weight and that the lack of fuel opacity readings at night allows
PREPA to make its "worst plumes assaults" against the Catano
residents without detection. We have read CUCCo's comments and the
responses of the United States. All these questions are answerable
only by recourse to experts. We cannot say that the position of
the United States on any of these well plumbed issues was an abuse
of discretion or, once accepted by the court, constituted an abuse
of discretion. Other issues touched upon by CUCCo in its brief,
such as allegedly inadequate self-policing incentives, indefinite
compliance dates, and lack of measures to reduce pollution are
mentioned only cursorily, without record reference or
documentation. 
 With regard to the public interest and consistency with the
objectives of Congress, the basic thrust of CUCCo's objection is
that the decree, while going in the right direction and with many
eminently supportable provisions, does not go far enough. 
Particularly, CUCCo argues that the penalties are so low, in
relation to PREPA's resources, that they do not constitute a
deterrent. But, as is true of consent decrees generally, they are
built upon compromise and compromise in turn is a product of
judgment. We are unable to say that the penalty level established
by the decree represents an abandonment of judgment by the United
States. See, e.g., id. at 52 (upholding agreement that made
"significant progress" even if court itself might have taken a
tougher stance).
 We therefore conclude that the record amply supports the
district court's judgment that the decree is fair, adequate,
reasonable, and consistent with the public environmental and health
objectives of Congress.
 IV. Was Denial of Counsel Fees an Abuse of Discretion?
 Two months after entry of the decree the district court denied
CUCCo's application for costs and counsel fees, without
explanation. This issue is complicated by a threshold question of
whether the Clean Water Act grants courts the authority to award
counsel fees to an intervenor in an enforcement action. Section
505(d) of that Act provides that the court in "any action brought
pursuant to this section, may award costs of litigation (including
reasonable attorney and expert witness fees) to any prevailing or
substantially prevailing party, whenever the court determines such
award is appropriate." 33 U.S.C. 1365(d). Section 505(b)
provides that no action may be commenced if the EPA Administrator
has brought suit, but a citizen "may intervene as a matter of
right." 33 U.S.C. 1365(b)(1)(B). There exists a question
currently undecided at the court of appeals level whether, in a
case brought under the Clean Water Act, an intervenor, as
distinguished from a plaintiff which has initiated its own suit, is
entitled to counsel fees. 
 Although this issue was argued below, as well as whether CUCCo
was a "prevailing party," the district court merely denied the
petition for costs and fees without particularity. We consider
this legal issue to be not free from difficulty and would prefer
not to decide it unless the only obstacle to an award of costs and
fees is the eligibility for fees of an intervenor in a Clean Water
Act matter. Cf. T I Fed. Credit Union v. Delbonis, 72 F.3d 921,
927 (lst Cir. 1995) ("Sound judicial policy counsels against
deciding complicated legal issues where a clear, principled basis
for reaching the same result exists.").
 In Farrar v. Hobby, 506 U.S. 103 (1992), the Court restated
its "generous formulation" of the term "prevailing party" in the
following words: "plaintiffs may be considered 'prevailing parties'
for attorney's fees purposes if they succeed on any significant
issue in litigation which achieves some of the benefit the parties
sought in bringing suit." Id. at 109 (internal quotations omitted). 
It further elaborated on this definition: "In short, a plaintiff
'prevails' when actual relief on the merits of his claim materially
alters the legal relationship between the parties by modifying the
defendant's behavior in a way that directly benefits the
plaintiff." Id. at 111-12. We have described this articulation as
leaving to the district court "a good deal of latitude." Stanton
v. Southern Berkshire Reg'l Sch. Dist., 197 F.3d 574, 576 (lst Cir.
1999). As for the issue of appropriateness, we can do no better
than reflect the reaction of the Court in Ruckelshaus v. Sierra
Club, 463 U.S. 680 (1983), that "[i]t is difficult to draw any
meaningful guidance from [an attorney's fees provision's] use of
the word 'appropriate,' which means only 'specially suitable; fit,
proper.'" Id. at 683 (citation omitted). The Court referenced a
Senate Report regarding the section, stating that its purpose was
to underscore the committee's intent that a court may "in its
discretion" award costs. See id. at 683 n.2.
 The district court, which has followed the development of this
litigation and the evolution of this decree, is clearly in a
superior position to make judgments on these issues. For, unlike
our decision concerning the minimal requirements of fairness,
adequacy, reasonableness, and consistency with Congressional
objectives, such decisions are not restrained by considerations of
deference to settlements, to the nature of compromise, and to
specially equipped and committed public agencies. The district
court is vested with wide discretion and brings to bear an ability
to weigh against the total background the significance of any
contributions and the appropriateness of any award of fees and
costs. Because the district court provided no explanation for its
denial of attorney's fees to CUCCo, it is unclear whether the court
decided that CUCCo was not a prevailing party, that fees were not
appropriate, that the Clear Water Act did not authorize fees in
these circumstances, or any combination of these reasons.
 We therefore affirm the entry of the consent decree but remand
the case to the district court for the limited purpose of
revisiting the issue of CUCCo's request for attorney's fees.
 Affirmed in part and remanded in part for further proceedings
consistent with this opinion. No costs.