UNITED STATES of America,
Plaintiff, Appellee,

v.

COMUNIDADES UNIDAS CONTRA
LA CONTAMINACION, Plaintiff–
Intervenor, Appellant,

v.

Puerto Rico Electric Power Authority,
Defendant, Appellee.

No. 99–1752.

United States Court of Appeals,
First Circuit.

Heard Jan. 5, 2000.

Decided Feb. 25, 2000.

**276**

Ana L. Toledo for appellant.

Mark R. Haag, Attorney, Department of Justice, Environment & Natural Resources Division, with whom Lois J. Schiffer, Assistant Attorney General, Peter Flynn and Andrew Mergen, Attorneys, Department of Justice, Environment & Natural Resources Division were on brief for the United States.

Melissa H. Maxman with whom Sandra A. Jeskie, Lawrence W. Diamond, Marco A. Gonzalez, Terry Philip Segal, Richard M. Wong, and John Uphoff–Figueroa were on brief for Puerto Rico Electric Power Authority.

Before SELYA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

This is an end note to wide-ranging, lengthy, and technically complex litigation begun in 1993 by the United States against the Puerto Rico Electric Power Authority (PREPA) for violations of some five federal environmental statutes committed at its four electric generating power plants and one transmission center. The two parties finally succeeded in negotiating an agreement that was converted by district court approval into a consent decree in 1999.

In the course of the proceedings, an organization named Comunidades Unidas Contra la Contaminacion (CUCCo), representing the inhabitants of Catano, a center of concentration of various industrial facilities and two of PREPA's plants, felt that its interests were not being sufficiently protected and successfully sought intervention as a party in 1996. Although denied an evidentiary hearing, it submitted voluminous comments addressing flaws in the proposed consent decree. Many of its comments, which fell under the Clean Water Act, were accepted in the decree's final version, but CUCCo's request for counsel fees was summarily denied.

The issues raised by CUCCo on appeal are: (1) whether the district court erred in refusing to hold an evidentiary hearing on the adequacy of the decree; (2) whether it erred in failing to state reasons why it deemed the decree to be fair, reasonable, and consistent with the objectives of the relevant legislation; and (3) whether the court erred in denying counsel fees to CUCCo.

## I. Factual Background

A brief synopsis of the case, insofar as is relevant to these issues, is as follows. The government's suit charged PREPA's four plants and its transmission center with violating air quality and emissions limitations of the Clean Air Act, 42 U.S.C. §§ 7401–7431; Clean Water Act National Pollutant Discharge Elimination System requirements, 33 U.S.C. §§ 1311, 1342, and oil pollution regulations, 33 U.S.C. § 1321; various reporting requirements relating to hazardous substances required by the Emergency Planning and Community Right–to–Know Act, 42 U.S.C. §§ 11004, 11022, and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9603; and underground storage tank requirements of the Resource Conservation and Recovery Act, 42 U.S.C. § 6991b. Civil penalties and injunctive relief were sought.

By 1995, negotiations between the United States, through the Environmental Protection Agency (EPA), and PREPA had evolved such that the parties urged the district court to revise the litigation schedule to focus on settlement. A year later, in April of 1996, unsatisfied with the progress, CUCCo moved to intervene and participate in settlement negotiations. The district court granted the motion to intervene, reserving a decision as to the extent of intervention to be allowed.

In January of 1997, the United States filed a proposed consent decree, which contemplated settlement of all of its claims and included compliance schedules, civil penalties, and environmental improvement projects. CUCCo objected immediately and sought rejection, because it had not been allowed to participate in the negotiations. The court, on February 7, 1997, denied the motion, indicated that CUCCo should submit its comments during the public comment period, and added that CUCCo, having been granted intervenor status, was more than "a mere spectator," and, if any of its concerns remained unanswered after conclusion of the public comment process, there would be an "opportunity to raise its objections directly before the Court at an evidentiary hearing to be scheduled, if and when the need arises." Shortly thereafter, in response to a government motion for clarification, the court said that its final decision regarding an evidentiary hearing was within its discretion—in other words, it would "allow the opportunity for a hearing if fairness requires it."

An expanded period of 140 days for public comment then followed, which ended on June 25, 1997, and drew only 5 commentors. CUCCo submitted over 50 pages of comments on Clean Air Act issues, among other commentary, together with attachments of 700 pages; its expert, Servicios Cientificos y Tecnicos, submitted on CUCCo's behalf a 23 page study addressing Clean Water Act issues; the United States Fish and Wildlife Service made largely the same points as Servicios; one individual took a position diametrically opposed to CUCCo, arguing that the proposed decree was too severe in requiring a sulfur limitation for boiler emissions of 1.5%; and another individual simply endorsed the Land Acquisition Project to acquire and preserve a parcel of ecologically vulnerable land in the Catano area.

Thereupon, the United States and PREPA undertook to consider the comments and renegotiate. There were meetings, telephone conferences, and correspondence with CUCCo and others. Technical personnel, explanatory material, and documents were made available. CUCCo's comments, challenging the decree's Clean Air Act compliance provisions, the Land Acquisition Project, the settlement process, community participation, and refusal to lower the sulfur content of boiler fuel to 0.5% by weight were addressed and rejected in an EPA response of some 55 pages.

The submission of Servicios Cientificos y Tecnicos on behalf of CUCCo, however, received a largely favorable response of 21 pages with an 18 page tabular attachment from EPA. Servicios, addressing Clean Water Act issues, had made the point that a large number of interim thermal discharge effluent limits were too high. In many instances, for example, PREPA's plants had already reduced the effluent discharge below the proposed interim limits which were to govern until the final limits became applicable. EPA agreed that a number of interim limits were not restrictive enough. It had begun to review these limits shortly after receiving the oral comments that followed the lodging of the proposed decree and had effected "often significant reductions of maximum allowable effluent discharge during the 'interim' period prior to the time when final compliance with the underlying NPDES permit is required."

EPA agreed that blind adherence to a particular statistical method was unwise and that its approach must be tempered by the best engineering and scientific judgment. It eliminated, as unfairly affecting a limits determination, high data points for which there were no explanation. It included, as urged, newly available data for 1996, and it eliminated interim limits more lenient than the existing underlying permit limits. It also pointed out that, by the time the revised interim limits had been negotiated and included in the proposed final decree, they would apply for only a limited time, expiring for the most part in

April 1999. There was, however, one important exception: the interim limits for such discharges at the San Juan plant would be effective indefinitely, subject to later statutory proceedings relating to an application for waiver.

In sum, of the 81 interim effluent limits appearing in the initial proposed consent decree, 18 were eliminated entirely, while 46 of the remaining 63 were made more stringent, "often substantially so," mainly due to the comments of Servicios Cientificos y Tecnicos.

On February 10, 1998, the United States presented and moved for the approval of the revised consent decree. Its filings included a substantial memorandum in support of approval, the 158 page decree, and over 200 pages of attachments. It contained a civil penalty of $1.5 million for past violations, $3.5 million for the acquisition of ecologically sensitive lands and training fire department personnel in dealing with hazardous materials, and injunctive relief covering air quality, water quality, oil spills, hazardous chemicals, CERCLA issues, care of underground storage tanks, and the services of an environmental review contractor. The decree also recited, on its second page, "the Parties agree and this Court finds that this Consent Decree has been negotiated by the Parties in good faith, that implementation of this Consent Decree will avoid prolonged and complicated litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest."

After further exchanges between the government and CUCCo, addressing the latter's continuing concerns, and no change of position, CUCCo again moved for an evidentiary hearing in April of 1998. In November of 1998, the United States moved for immediate entry of the decree and on March 16, 1999, the district court ordered, in the margin of the motion, that the decree be filed, noting, "It will be signed and entered as a final judgment immediately." On March 19, the court signed the decree. The court also denied as moot CUCCo's latest request for an evidentiary hearing and denied without opinion CUCCo's application for attorney's fees and costs.

## II. *Was an Evidentiary Hearing Mandated?*

In addressing the refusal of the district court to grant an evidentiary hearing, we are constrained to a review for abuse of discretion. As we said in *United States v. Cannons Engineering Corp.*, 899 F.2d 79 (1st Cir.1990), the key consideration is whether there has been " 'a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions.' " *Id.* at 93 (quoting *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir.1988)). We cannot say here that CUCCo, having presented its own substantial comments, which were seriously considered and adopted to the extent that they regarded Clean Air Act issues, and having had further opportunity to meet and confer with the negotiating parties and to present its views at several stages to the court, was denied this opportunity.

Recently we acknowledged the reality of this type of broad, technologically driven litigation, when we observed in *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081 (1st Cir.1994), that "requests for evidentiary hearings are, for the most part, routinely denied—and properly so— at the consent decree stage in environmental cases." *Id.* at 1085. CUCCo would discount this teaching on the ground that *Charles George* dealt with the issue of allocating monetary responsibility for the remedial clean-up of polluted areas in a CERCLA case, whereas the instant case is concerned with health hazards and future protection of the environment. But we do not see the principle as so confined. Our reliance in *Charles George* on *United States v. Metropolitan St. Louis Sewer District*, 952 F.2d 1040 (8th Cir.1992), a case brought under the Clean Water Act,

is indicative of this judgment. In that case the court stated that, once intervenors had the opportunity to file objections, there was little else that could be done. *See id.* at 1044 (citing *United States Environmental Protection Agency v. City of Green Forest,* 921 F.2d 1394, 1402 (8th Cir.1990)).

A reality check makes clear why there can be no unconditional right to an evidentiary hearing in such cases as this. Here, the two parties, the United States and PREPA, had been negotiating for three years, more intensely during the third year. Whether or not the pace had been sluggish, they had finally arrived at agreement over a host of issues. They were for the most part exceedingly technical and required the use of scientific or engineering data and statistics. To allow evidentiary hearings on the call of any party allowed to intervene would delay, complicate, and perhaps jeopardize the timely resolution of the issues. After all, the decree to be approved was a consent decree; sophisticated adverse parties, represented by their top professionals in dealing with environmental problems, had found common ground.

CUCCo urges us to seize on statements favorable to hearing the objections of intervenors alluded to in *Local Number 93, International Ass'n of Firefighters v. Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). The statement of the Court that an intervenor has the right to introduce evidence at a hearing on a decree merely referenced the statutory right of an affected person in an employment discrimination case to present objections to a judgment. *See id.* at 529, 106 S.Ct. 3063. If there were a hearing, such a person would have the right to be heard. But this is not the same as guaranteeing an evidentiary hearing on demand. The *Cleveland* Court's citation of *Kirkland v. New York State Department Of Correctional Services,* 711 F.2d 1117 (2d Cir.1983), is enlightening, for that case held only that intervenors in race discrimination cases have a sufficient interest to argue that the

decree is unreasonable. *See id.* at 1126. The opportunity to object or to argue is not translatable into an unconditional right to have an evidentiary hearing. In any event, we are constrained by our own more recent precedent, namely, *Charles George,* applicable to this kind of case. *See Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.,* 991 F.2d 935, 939 n. 3 (1st Cir.1993) ("In a multi-panel circuit, newly constituted panels, generally speaking, are bound by prior panel decisions on point.").

CUCCo has a more particularistic argument: that the district court unequivocally promised it an evidentiary hearing. But, as the passages of the court's two orders we have quoted reveal, the court couched its promise with the caveat that a hearing would be vouchsafed "if need arises" or "if fairness requires." This seems only a sensible reservation; a court would not likely undertake to abandon the exercise of all future discretion. We do not believe the court abused its discretion in later determining that there was no need for an evidentiary hearing.

### III. *Is the Lack of Reasoned Judgment Fatal to the Decree?*

A more troubling argument advanced by CUCCo is that the district court did not set forth its own grounds for finding that the consent decree was fair, reasonable, and in the public interest, and that it did not set forth reasons why CUCCo's objections were misplaced. The district court, according to CUCCo, merely signed the decree, ordering it to be entered. In so doing, CUCCo argues, the court abrogated its responsibility to make an independent judgment.

██ There is no question but that a consent decree must bear the imprimatur of a judicial judgment that it is fair, adequate, reasonable, and consistent with the objectives of Congress. *See Conservation Law Found. v. Franklin,* 989 F.2d 54, 58 (1st Cir.1993). The United States, PREPA, and CUCCo all accept this set of

standards. Thus there is no allegation that an error of law has been committed by the district court. Rather, the question is whether the record contains adequate facts to support the decision of the district court to approve the proposed compromise. As to this, as the Supreme Court has observed, "a reviewing court would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 437, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

As the United States acknowledged in its brief in an understated manner, "an explanation may have been advisable." We grant that a judge confronted with such a multi-faceted, technical, voluminous document, agreed to by two sophisticated and resourceful adversaries, faces what is on the surface a dilemma between essaying an exhaustive and detailed appraisal and contenting herself with rehearsing a brief and conclusory litany. We say "on the surface" because a judge who has lived with litigation spanning such a long time will perceive a middle course suggested by the history of the case. The judge will know the major issues that have been contested and resolved, will be acquainted with the evidence for and against resolutions achieved, and can indicate a basis for confidence that they lie within the area of permissible discretion. This gives a reviewing court confidence that a neutral adjudicator, intimately acquainted with the case, has focused on the essential criteria and found them not lacking.

Having said this, we are most reluctant, however, to further extend these proceedings unless we sensed something deeply amiss. The proceedings lasted over five and one half years. The court had the benefit of an initially proposed decree in 1997. Then it had the second proposed decree, its attachments, including all comments and responses thereto, and the government's memorandum accompanying its motion to enter. It withheld action on the decree for over a year while the United States and CUCCo further conferred.

The decree was finally endorsed by the court on March 19, 1999. As we have noted, a prominent introductory section recited that

> [T]he Court finds that this Consent Decree has been negotiated by the Parties in good faith ... and that this Consent Decree is fair, reasonable, and in the public interest.

We must presume that the court was fully cognizant of this solemn representation of its conclusions. Moreover, any further proceedings would cause the loss or delay of the benefits of the $3.5 million civilian penalty, construction timetables, interim discharge limitations, stipulated penalty provisions, and work on the environmental projects contained in the decree.

■ At this point we underscore two policies that heavily brigade the decree. The first is the strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts. *See Conservation Law Found.,* 989 F.2d at 59. Moreover, such a policy has added bite where the settlement has been advanced for entry as a decree by a government actor "committed to the protection of the public interest" and specially trained and oriented in the field. *See Cannons Eng'g Corp.,* 899 F.2d at 84.

■ But the conclusory recitation in the decree, even viewed in conjunction with the high degree of deference owed to contracting parties in this kind of case, still leaves us without a more reasoned judicial determination. We therefore choose a route rarely taken; we examine the record ourselves to see if we can find that the decree is fair, reasonable, and consistent with environmental goals. We are in essentially the same position as the court in *Van Horn v. Trickey,* 840 F.2d 604 (8th Cir.1988), where the district court, in approving a class action prison reform settle-

ment, did not address the fairness, reasonableness, or adequacy of the arrangement. The appeals court found that the record contained enough facts to support the district court's approval of the settlement. *See id.* at 607.

We therefore scrutinize the record. We accept as our standard the precept reiterated in *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067 (W.D.N.Y.1982), *aff'd*, 749 F.2d 968 (2d Cir.1984), that " '[t]he court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.' " *Id.* at 1072 (citation omitted). Our review lacks the sense of command and "feel" of a complex case that a managing court would have. But we shall focus on each basic criterion and seek for sufficient record evidence to give us confidence that it is adequately supported.

Addressing the fairness of the decree, we have seen no evidence that the United States and PREPA had other than an arm's length, good faith bargaining record. We say this, while acknowledging that CUCCo has charged PREPA with being the "worst-run utility" and the United States as a "look-the-other-way" plaintiff. As with many other charges levied, this lacks specifics, not to mention record references. Indeed, CUCCo's charges are reminiscent of Virginia's objections to the decree in a case cited by CUCCo, *United States v. District of Columbia*, 933 F.Supp. 42 (D.D.C.1996), namely, that the parties lacked "adversarial vigor" and that many years of mismanagement warranted much larger fines than those proposed in the decree. *See id.* at 48–49.

A second aspect of fairness is its substantive side, what we have characterized as "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87. But these concepts do not lend themselves to verifiable precision. In environmental cases, EPA's expertise must be given "the benefit of the doubt when weighing substantive fairness." *Id.* at 88. Here, the present and continuing burdens laid on PREPA, both in monetary penalties and in performance requirements are very substantial. We have examined all of EPA's responses to CUCCo's comments and have found them persuasive.

As for adequacy and reasonableness, we have surveyed the plethora of compliance requirements, qualitative standards, and ongoing monitoring and reporting devices incorporated in the decree. Most of these, in fact, have been supported by CUCCo which, at one point, sought to bring about a partial enforcement of the decree. Again, we see similarities between this decree and that approved in *District of Columbia*: "tailored relief" covering short and long term equipment improvements, detailed schedules, required contractual obligations, reporting requirements, etc. *See District of Columbia*, 933 F.Supp. at 50–51. Indeed, in *District of Columbia*, the United States had made a "conscious decision not to seek civil penalties." *Id.* at 51.

CUCCo's major technically based objections are that it was not reasonable to allow PREPA to use fuel with a 1.5% sulfur content in weight and that the lack of fuel opacity readings at night allows PREPA to make its "worst plumes assaults" against the Catano residents without detection. We have read CUCCo's comments and the responses of the United States. All these questions are answerable only by recourse to experts. We cannot say that the position of the United States on any of these well plumbed issues was an abuse of discretion or, once accepted by the court, constituted an abuse of discretion. Other issues touched upon by CUCCo in its brief, such as allegedly inadequate self-policing incentives, indefinite compliance dates, and lack of measures to reduce pollution are mentioned only cur-

sorily, without record reference or documentation.

With regard to the public interest and consistency with the objectives of Congress, the basic thrust of CUCCo's objection is that the decree, while going in the right direction and with many eminently supportable provisions, does not go far enough. Particularly, CUCCo argues that the penalties are so low, in relation to PREPA's resources, that they do not constitute a deterrent. But, as is true of consent decrees generally, they are built upon compromise and compromise in turn is a product of judgment. We are unable to say that the penalty level established by the decree represents an abandonment of judgment by the United States. *See, e.g., id.* at 52 (upholding agreement that made "significant progress" even if court itself might have taken a tougher stance).

We therefore conclude that the record amply supports the district court's judgment that the decree is fair, adequate, reasonable, and consistent with the public environmental and health objectives of Congress.

### IV. *Was Denial of Counsel Fees an Abuse of Discretion?*

■ Two months after entry of the decree the district court denied CUCCo's application for costs and counsel fees, without explanation. This issue is complicated by a threshold question of whether the Clean Water Act grants courts the authority to award counsel fees to an intervenor in an enforcement action. Section 505(d) of that Act provides that the court in "any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). Section 505(b) provides that no action may be commenced if the EPA Administrator has brought suit, but a citizen "may intervene as a matter of right." 33 U.S.C. § 1365(b)(1)(B). There

exists a question currently undecided at the court of appeals level whether, in a case brought under the Clean Water Act, an intervenor, as distinguished from a plaintiff which has initiated its own suit, is entitled to counsel fees.

Although this issue was argued below, as well as whether CUCCo was a "prevailing party," the district court merely denied the petition for costs and fees without particularity. We consider this legal issue to be not free from difficulty and would prefer not to decide it unless the only obstacle to an award of costs and fees is the eligibility for fees of an intervenor in a Clean Water Act matter. *Cf. T I Fed. Credit Union v. DelBonis,* 72 F.3d 921, 927 (1st Cir.1995) ("Sound judicial policy counsels against deciding complicated legal issues where a clear, principled basis for reaching the same result exists.").

In *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the Court restated its "generous formulation" of the term "prevailing party" in the following words: "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 109, 113 S.Ct. 566 (internal quotations omitted). It further elaborated on this definition: "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 111–12, 113 S.Ct. 566. We have described this articulation as leaving to the district court "a good deal of latitude." *Stanton v. Southern Berkshire Regional Sch. Dist.,* 197 F.3d 574, 576 (1st Cir.1999). As for the issue of appropriateness, we can do no better than reflect the reaction of the Court in *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), that "[i]t is difficult to draw any meaningful guidance from [an attorney's fees provision's] use of the word 'appropri-

ate,' which means only 'specially suitable; fit, proper.'" *Id.* at 683, 103 S.Ct. 3274 (citation omitted). The Court referenced a Senate Report regarding the section, stating that its purpose was to underscore the committee's intent that a court may *"in its discretion"* award costs. *See id.* at 683 n. 2, 103 S.Ct. 3274.

The district court, which has followed the development of this litigation and the evolution of this decree, is clearly in a superior position to make judgments on these issues. For, unlike our decision concerning the minimal requirements of fairness, adequacy, reasonableness, and consistency with Congressional objectives, such decisions are not restrained by considerations of deference to settlements, to the nature of compromise, and to specially equipped and committed public agencies. The district court is vested with wide discretion and brings to bear an ability to weigh against the total background the significance of any contributions and the appropriateness of any award of fees and costs. Because the district court provided no explanation for its denial of attorney's fees to CUCCo, it is unclear whether the court decided that CUCCo was not a prevailing party, that fees were not appropriate, that the Clear Water Act did not authorize fees in these circumstances, or any combination of these reasons.

We therefore affirm the entry of the consent decree but remand the case to the district court for the limited purpose of revisiting the issue of CUCCo's request for attorney's fees.

*Affirmed in part and remanded in part for further proceedings consistent with this opinion. No costs.*