# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-1572
_____

Center for Biological Diversity

*Plaintiff - Appellee*

v.

Sarah Strommen, in her official capacity as Commissioner of the Minnesota
Department of Natural Resources

*Defendant - Appellee*

v.

Minnesota Trappers Association; National Trappers Association; Fur Takers of
America, Inc.

*Intervenor Defendants - Appellants*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: February 14, 2024
Filed: August 14, 2024
_____

Before SMITH, Chief Judge,[1] BENTON, and STRAS, Circuit Judges.
_____

---

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

STRAS, Circuit Judge.

When are consent decrees fair and reasonable? The district court[2] thought this one, which requires Minnesota to take additional steps to protect Canadian lynx, qualifies. And although a coalition of animal trappers disagrees, we affirm.

I.

The Canadian lynx is a medium-sized wild cat with tufted ears, long hind legs, and a goatee. The federal government has designated it as a "threatened" species because of its "low [population] densit[y]." 65 Fed. Reg. 16052, 16081 (Mar. 24, 2000). Between 50 and 200 live in Minnesota.

For years, the Center for Biological Diversity has pressed Minnesota to do more to protect lynx from trappers, who sometimes "incidental[ly] take" them while trying to catch legal game. *See* 16 U.S.C. § 1532(19) (explaining that someone "take[s]" an endangered or threatened animal when he "harass[es], harm[s], pursue[s], hunt[s], shoot[s], wound[s], kill[s], trap[s], capture[s], or collect[s]" it). Its first case against Minnesota led to an injunction and the creation of a "Lynx Management Zone" in the northeast corner of the state. *See Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1081–82 (D. Minn. 2008) (concluding that Minnesota had violated the Endangered Species Act).

After nine additional takings, the Center filed another lawsuit. This time, the allegation was that Minnesota had not done enough to limit trapping, which poses a "risk[] [of] further injur[y] and death" to the lynx. Following an unsuccessful attempt to dismiss the case, Minnesota initiated settlement talks. Concerned that neither party would "adequately represent th[eir] interest[s]," three pro-trapping organizations intervened. Fed. R. Civ. P. 24.

---

[2]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

-2-

Over their objections, the talks ended in a proposed consent decree. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992) ("A consent decree . . . embodies an agreement of the parties" and is "a judicial decree that is subject to the rules generally applicable to other judgments and decrees."). It required Minnesota to put "additional restrictions" on snare and foothold traps in the Lynx Management Zone within 40 days "[b]y whatever regulatory means are necessary, including expedited emergency rulemaking." *See* Minn. Stat. § 84.027, subd. 13 (specifying the procedures for this type of rulemaking).

The trappers asked the district court to reject it. In their view, it was "prejudicial and harmful" and would eliminate all "meaningful snaring in the Lynx Management Zone." They also argued that state law prevented Minnesota from adopting the new regulations in the way the consent decree proposed.

After hearing from all sides, the district court disagreed. Its view was that the consent decree was a "reasonable midpoint between the [parties'] litigati[ng] positions and [had] a reasonable relationship to [each side's] claims and . . . defenses." We must now determine whether the court abused its discretion in approving it. *See United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992).

II.

There are multiple judge-made rules that have arisen around the approval of consent decrees, one of which is that they must be procedurally "fair[]." *EEOC v. Prod. Fabricators, Inc.*, 666 F.3d 1170, 1172 (8th Cir. 2012) (citation omitted). By procedurally fair, we mean the negotiations must have been "in good faith and at arm's length." *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1020 (8th Cir. 2002). The "candor, openness, and bargaining balance" of the negotiations are factors to consider, but what matters in the end is whether there was "fair play." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86–87 (1st Cir. 1990).

Here, the negotiations lasted several months, and the consent decree appears to have been the product of a hard-fought compromise. *See Killer Joe Nev., LLC v. Does 1–20*, 807 F.3d 908, 911 (8th Cir. 2015) (deciding what gives rise to an abuse of discretion by a district court). Before the trappers intervened, Minnesota and the Center had spent more than a year litigating the case. The negotiations underlying the consent decree "spanned more than seven months and involved significant input by subject matter experts." Although the trappers oppose the settlement, they do not allege collusion or any other type of misconduct. *See Common Cause R.I. v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020); *United States v. Oregon*, 913 F.2d 576, 586 (9th Cir. 1990).

Instead, they believe they deserved more of an opportunity to "air [their] objections." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986). It is tough to figure out what more the district court could have done. First, even though they entered the case late and were never really defendants, the trappers had an opportunity to file an answer. Then, once they formally objected to the reasonableness of the consent decree, the court held a lengthy evidentiary hearing to consider the points they raised. *See United States v. Union Elec. Co.*, 132 F.3d 422, 430 (8th Cir. 1997) (holding that a district court did *not* abuse its discretion by approving a consent decree *without* giving the intervenors an evidentiary hearing). Finally, to button things up, the court allowed the parties, including the trappers, one last opportunity to submit additional briefing and "relevant evidence." *Local No. 93*, 478 U.S. at 529. There was no shortage of chances for them to raise objections.

Instead, they held back. The arguments they try to raise now—like a lack of associational standing,[3] the application of res judicata, and the failure to state a

---

[3]Standing is the one issue we must raise on our own. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). Although we questioned the existence of associational standing before oral argument, the Center seeks to supplement the record with an interrogatory response naming three members who regularly travel to northern Minnesota to see lynx. *See Summers v. Earth Island Inst.*, 555 U.S. 488,

claim—all came up in their answer, but they never filed a motion to dismiss or for summary judgment. Nor did they raise those specific arguments as reasons to reject the consent decree. *See Union Elec. Co.*, 132 F.3d at 430 (holding that the district court did not abuse its discretion in approving a consent decree because "[t]he [i]ntervenors had ample opportunity to file objections"). To the extent they argue that the district court kept them from "relitigat[ing] matters already determined in the case," *Arizona v. California*, 460 U.S. 605, 615 (1983), nothing stood in the way other than their own approach to the litigation.

III.

Consent decrees must also be "reasonable." *BP Amoco*, 277 F.3d at 1021. The reasonableness inquiry is "multifaceted," *Cannons*, 899 F.2d at 89, although two considerations are especially important. The first is whether the consent decree "spring[s] from and serve[s] to resolve a dispute within the court's subject-matter jurisdiction." *Local No. 93*, 478 U.S. at 525. Closely related is the second: whether the relief it provides "com[es] within the general scope of the case made by the pleadings" and "further[s] the objectives of the law upon which the complaint was based." *Id.* (first alteration in original) (citation omitted). Within these basic limits, the parties "enjoy wide latitude in terms of what they may agree to" in a consent decree. *Conservation L. Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 59 (1st Cir. 1993).

A.

At its core, this lawsuit is about alleged violations of the Endangered Species Act, which raises a federal question that falls within the district court's subject-matter jurisdiction. *See Benalcazar v. Genoa Twp.*, 1 F.4th 421, 425 (6th Cir. 2021)

---

498 (2009) (requiring such a showing for an association to claim Article III standing). It shows that "at least one of [its] members," if not all three, "has had continuous standing," so we grant the motion. *Worth v. Jacobson*, 108 F.4th 677, 686 (8th Cir. 2024) (approving of a similar procedure).

(explaining that if a dispute is "arguabl[y]" about a federal issue, the district court can approve a consent decree settling it). According to the complaint, at least nine Canadian lynx had been "take[n]" since the first lawsuit. 16 U.S.C. § 1538(a)(1)(B). The Center raised a "[non]frivolous" claim that, just like the first time, Minnesota was ultimately responsible for the alleged violations. *Benalcazar*, 1 F.4th at 424; *cf. Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997) (holding that Massachusetts committed a violation when licensed fishermen injured protected whales).

The consent decree proposed a set of regulations designed to curb future violations. *See Local No. 93*, 478 U.S. at 525; *Prod. Fabricators*, 666 F.3d at 1172 (explaining that a consent decree "must be formulated to protect federal interests"). One expert testified, for example, that decreasing the diameter of foothold traps would lead to fewer "significant . . . injuries that could affect [the] animal upon release." And the other thought that keeping snare traps away from rooted vegetation and fences would "reduce lethality." Lowering the number of deaths of a threatened species like the lynx "further[s] the objectives" of the Endangered Species Act. *Local No. 93*, 478 U.S. at 525. And so does preventing trappers from "harass[ing]," "wound[ing]," and "trap[ping]" lynx, each of which also qualifies as a taking. 16 U.S.C. §§ 1532(19), 1538(a)(1)(B); *see Mausolf v. Babbitt*, 125 F.3d 661, 670 (8th Cir. 1997) (upholding a regulation that "m[ight] prevent *some* incidental takings" of a protected species (emphasis added)).

Reasonableness does not require perfection. By its nature, a consent decree is a "compromise[] in which the parties give up something they might have won in litigation." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 235 (1975). The Center sought to give the lynx complete protection from "trapping that risks further injuries and death." It "compromise[d]" instead and settled for something less: the elimination of particularly risky practices. *Id.*; *see Cannons*, 899 F.2d at 90 ("[T]he reasonableness of a proposed settlement must take into account foreseeable risks of loss."). The consent decree was a step in the "right direction." *United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 282 (1st Cir. 2000) (explaining that a consent decree was reasonable and rejecting an intervenor's

argument that it did not go "far enough"); *cf. United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (noting that "remedies" in a consent decree can be "less than vigorous").

## B.

The details show why. The objective of the proposed regulations was to increase an ensnared lynx's chance of survival. One requires the use of a loop stop to prevent the noose on a trap from closing too tight, which "substantially if not fully eliminate[s] the risk of mortality caused from constriction pressure on the arteries in the neck." Another "displace[s]" pressure on a lynx's neck "across a larger surface" and prevents strangulation by mandating a specific type of snare lock. And keeping snares away from trees and fences stops a panicked lynx from entangling itself, which risks "pushing" the snare "down onto [its] arteries" and strangling it. Studies and expert testimony both suggested that these measures would reduce lynx mortality.

The trappers' expert, on the other hand, thought the new regulations were dangerous to *both* the animal and the continued existence of trapping in the Lynx Management Zone. In his opinion, loop stops could tear the skin and fur of an ensnared lynx as it struggles. Not to mention that the regulations make trapping more expensive and difficult. The alternative to using a nearby fence or root vegetation as a snare-trap anchor, for example, is pounding a stake into the frozen ground during a frigid Minnesota winter. Hardly a comparable burden.

These are legitimate concerns, but the district court reviewed the evidence and found that, notwithstanding the burden on trappers, each regulation would reduce the number of lynx killed. Even if a different interpretation of the evidence is possible, our job is to determine whether the consent decree's terms find "support[] [in] the record." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976). And here, they do. *See BP Amoco*, 277 F.3d at 1019 (explaining that we defer to "the district court's carefully[ ]exercised informed discretion").

# IV.

Finally, parties to a consent decree cannot agree to "violate the law." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990). The problem, according to the trappers, is that Minnesota agreed to bypass regular notice-and-comment rulemaking in favor of an expedited emergency process that has no application here. The district court disagreed, but the explanation requires delving into how Minnesota's regulatory process works.

Like their federal counterparts, agencies in Minnesota must typically use notice-and-comment rulemaking when adopting regulations. *See* Minn. Stat. § 14.14. In some situations, however, the Commissioner of Natural Resources can use a different method, including when "directed by statute, federal law, or *court order* to adopt, amend, suspend, or repeal a rule" and time is too short to comply with the usual statutory deadlines. *Id.* § 97A.0451–52 (emphasis added). One advantage of the expedited process is the absence of public hearings. *Compare id.* (no public-hearing requirement), *with id.* § 14.25 (requiring one if "25 or more" people request it during the regular notice-and-comment period).

An even more turbo-charged process is available too: expedited emergency rulemaking. *See id.* § 84.027, subd. 13. It allows the Commissioner of Natural Resources to bypass public comment completely by "publishing a notice" in the state register, but only if "conditions exist that do not allow the [C]ommissioner to comply with" regular emergency rulemaking. *Id.* § 84.027, subd. 13(b). The statute lists numerous possibilities, but the one the parties and the district court relied upon is the power to "adopt rules" to "prohibit or allow taking of wild animals to protect a species." *Id.* § 84.027, subd. 13(a)–(a)(1); *see id.* § 97B.605 (letting the Commissioner "prescribe limits and restrictions on" the "tak[ing] and possess[ion]" of "small game" like lynx). The prototypical example, according to the statute, is when it becomes necessary to "adjust season variables on an annual basis based upon current biological and harvest data." *Id.* § 84.027, subd. 13(b). That is, when data shows dwindling or expanding numbers require on-the-fly adjustments to the length

of the hunting season or the number of animals each hunter can take. It provides flexibility to deal with emergency situations.

One Minnesota court has interpreted the power broadly. When hundreds of farmed deer were entering the state with a neurodegenerative disease that could wipe out the native deer population, the Commissioner of Natural Resources acted quickly through expedited emergency rulemaking to put a stop to it. *See Minn. Deer Farmers Ass'n v. Minn. Dep't of Nat. Res.*, 979 N.W.2d 465, 467–68 (Minn. Ct. App. 2022). A group of deer farmers challenged the way the agency had adopted the emergency rules, but the Minnesota Court of Appeals concluded that it had acted within its statutory authority "to prevent or control wildlife disease." *Id.* at 471 (quoting Minn. Stat. § 84.027, subd. 13(a)(1)).

The parties could have reasonably relied on *Minnesota Deer Farmers* to support what they did here. The immediately preceding clause of the same statute, after all, allows the Commissioner of Natural Resources to follow the same regulatory blueprint when "prohibit[ing] or allow[ing] taking of wild animals to protect a species." Minn. Stat. § 84.027, subd. 13(a)(1). If the trappers disagree, nothing prevents them from challenging the validity of the new regulations in a separate state-court action. *See* Minn. Stat. §§ 14.44, 14.45; *see also Mammenga v. State Dep't of Hum. Servs.*, 442 N.W.2d 786, 789 (Minn. 1989) (explaining that Minnesota district courts can set aside an agency decision that is "arbitrary or capricious"). But in the absence of evidence that the parties "circumvented" state law, what we cannot do is unwind the consent decree. *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 270 (8th Cir. 2011).

V.

We accordingly grant the pending motion to supplement the record and affirm the judgment of the district court.

_____